## THE MOHEGAN TRIBE OF INDIANS OF CONNECTICUT *v.* THE MOHEGAN TRIBE AND NATION, INC., ET AL.
## (SC 16166)

McDonald, C. J., and Palmer, Sullivan, Callahan and Langenbach, Js.*

Argued October 27, 1999—officially released February 20, 2001

* The listing of justices reflects their seniority status on this court as of the date of argument.

Although Chief Justice McDonald and Justice Callahan reached the mandatory age of retirement before the date that this opinion officially was released, their continued participation on this panel is authorized by General Statutes § 51-198 (c).

*Joseph B. Burns*, with whom was *Lewis B. Rome*, for the appellant (plaintiff).

*John J. Carta, Jr.*, for the appellees (defendants).

*Opinion*

PALMER, J. The plaintiff, The Mohegan Tribe of Indians of Connecticut, which owns and operates the Mohegan Sun Casino in Montville, brought this action against the named defendant, The Mohegan Tribe and Nation, Inc. (Mohegan Tribe and Nation), among others,[1] seeking, inter alia, injunctive relief[2] for the defendant's alleged infringement of the plaintiff's trade name in violation of, inter alia, § 43 (a) of the Lanham Act, 15 U.S.C. § 1125 (a),[3] and principles of Connecticut com-

[1] The Confederation of the Mohegan-Pequot American Indian Nation and Affiliated Tribes, Inc. (Confederation) also is a defendant in this case. For ease of reference, we refer to the Mohegan Tribe and Nation and the Confederation collectively as the defendant. When necessary, and for the sake of clarity, we identify them individually by name. Both the Mohegan Tribe and Nation and the Confederation are corporations incorporated under the laws of the state of Connecticut.

The plaintiff also named several individuals as defendants. At the conclusion of the trial, however, the court dismissed the plaintiff's claims against those individual defendants and rendered judgment thereon. The plaintiff has not appealed from that portion of the court's judgment.

[2] The plaintiff originally sought compensatory damages, but withdrew that claim prior to trial.

[3] Section 43 (a) of the Lanham Act, which is codified at 15 U.S.C. § 1125 (a) (1994), provides: "(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

mon law.[4] After a court trial, the court rejected the plaintiff's claims and rendered judgment for the defendant. The plaintiff appealed to the Appellate Court and we transferred the appeal to this court.[5] We affirm the judgment of the trial court.

The following relevant facts are set forth in the trial court's memorandum of decision. The first Native Americans referred to as Mohegans[6] occupied land on the banks of the Hudson River in the region known today as New York state prior to the arrival of the European settlers. At the turn of the seventeenth century, a group of Mohegans left their tribal lands on the Hudson River and migrated to land within the borders of what is now the state of Connecticut. Various groups of Mohegans were involved in land disputes after the

"(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

"(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

"(2) As used in this subsection, the term 'any person' includes any State, instrumentality of a State or employee of a State or instrumentality of a State acting in his or her official capacity. Any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this [act] in the same manner and to the same extent as any nongovernmental entity."

[4] The plaintiff also claimed that the defendant had violated the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. The plaintiff acknowledges that the success of its CUTPA claim hinges on the success of its claims under the Lanham Act and state common law. Because we affirm the trial court's judgment rejecting the plaintiff's Lanham Act and common-law claims, the plaintiff's CUTPA claim also fails.

[5] We transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[6] As the trial court indicated, "Mohegan means wolf in the Algonquin family of languages." (Internal quotation marks omitted.) The term "Mohegan," which also has been incorporated into the English language as "Mohican," is defined as "an Indian people of southeastern Connecticut" and "a member of the Mohegan people." Webster's Third New International Dictionary.

turn of the seventeenth century, and the leadership of these groups was splintered. In 1966, however, John Hamilton, also known as Chief Rolling Cloud, emerged as a strong tribal leader and organized efforts to reclaim tribal lands that his people had lost. In 1970, a schism developed in the tribal leadership and Hamilton left to form his own group, which was known as the Mohegan Tribe and Nation. Hamilton died in 1988, before which he designated Eleanor Fortin to succeed him. The Mohegan Tribe and Nation, which is located in southeastern Connecticut, was incorporated in 1992. The incorporators of the Mohegan Tribe and Nation are Mohegan by virtue of ancestry.

The plaintiff is a group of Native Americans residing in southeastern Connecticut whose members did not follow Hamilton when he formed the Mohegan Tribe and Nation. In March, 1994, the federal government formally acknowledged the plaintiff as a sovereign American Indian nation.[7] 59 Fed. Reg. 12,140 (March 15, 1994), amended by 59 Fed. Reg. 37,144 (July 20, 1994); see Mohegan Nation of Connecticut Land Claims Settlement Act of 1994, § 2, 25 U.S.C. 1775 (a) (1) (1994). Furthermore, Congress expressly has found that the plaintiff "is the successor in interest to the aboriginal entity known as the Mohegan Indian Tribe"; 25 U.S.C. § 1775 (a) (2) (1994); and "has existed in the geographic area that is currently the State of Connecticut for a long period preceding the colonial period of the history of

---

[7] "Although this process is referred to both as 'recognition' and 'acknowledgment,' we refer to the federal administrative or congressional recognition of a tribe's special relationship with the federal government as 'acknowledgment.' This term 'more accurately reflect[s] the ethnohistorical reality of the United States' acknowledg[ment] [of] the existence of an extant and continuously surviving American Indian polity' . . . and also more readily distinguishes the process of federal acknowledgment from the recognition that may be afforded a tribe under state law." (Citation omitted.) *State* v. *Sebastian*, 243 Conn. 115, 117 n.2, 701 A.2d 13 (1997), cert. denied, 522 U.S. 1077, 118 S. Ct. 856, 139 L. Ed. 2d 756 (1998).

the United States." 25 U.S.C. § 1775 (a) (3) (1994).[8] The state of Connecticut also has recognized the plaintiff. See General Statutes § 47-59a (b).[9] In 1996, the plaintiff commenced construction of the Mohegan Sun Casino in Montville, which today is a thriving casino operation.[10] The plaintiff also conducts an annual festival, known as the "Wigwam Powwow," which celebrates Mohegan traditions and history through song, dance and story telling. In addition, the plaintiff makes presentations to schools and civic organizations regarding the Mohegan culture.

In 1996, Chief Moigu Standing Bear (Standing Bear) assumed leadership of the Mohegan Tribe and Nation and, later that year, that entity became part of an organization known as the Confederation of The Mohegan-Pequot American Indian Nation and Affiliated Tribes, Inc. (Confederation).[11] The defendant's income is

---

[8] We note that, according to the trial court, the formal acknowledgment documents mention the Mohegan Tribe and Nation, but those documents make it clear that the plaintiff, and not the Mohegan Tribe and Nation, is the federally acknowledged tribal entity.

[9] General Statutes § 47-59a provides: "Connecticut Indians; citizenship, civil rights, land rights. (a) It is hereby declared the policy of the state of Connecticut to recognize that all resident Indians of qualified Connecticut tribes are considered to be full citizens of the state and they are hereby granted all the rights and privileges afforded by law, that all of Connecticut's citizens enjoy. It is further recognized that said Indians have certain special rights to tribal lands as may have been set forth by treaty or other agreements.

"(b) The state of Connecticut further recognizes that the indigenous tribes, the Schaghticoke, the Paucatuck Eastern Pequot, the Mashantucket Pequot, the Mohegan and the Golden Hill Paugussett are self-governing entities possessing powers and duties over tribal members and reservations. Such powers and duties include the power to: (1) Determine tribal membership and residency on reservation land; (2) determine the tribal form of government; (3) regulate trade and commerce on the reservation; (4) make contracts, and (5) determine tribal leadership in accordance with tribal practice and usage."

[10] The trial court aptly characterized the Mohegan Sun Casino as immensely successful.

[11] See footnote 1 of this opinion. A group led by Fortin and a group led by Standing Bear each filed cross claims in this action asserting the legal right to use the name "The Mohegan Tribe and Nation." The trial court

derived primarily from the sale of arts and crafts and from federal grants and membership dues. Like the plaintiff, the defendant also conducts an annual festival, known as the Rolling Cloud Powwow, and it presents programs on Mohegan tradition and culture to interested members of the community. The Mohegan Tribe and Nation currently has an application pending before the Bureau of Indian Affairs seeking federal acknowledgment as a tribe. Additional facts will be set forth as necessary.

The plaintiff brought this action seeking to enjoin the defendant from using the names "Mohegan" and "Mohegan Tribe."[12] In particular, the plaintiff alleged that, "[i]f the [defendant is] allowed to continue to . . . [use those names, the plaintiff's efforts] to operate the Mohegan [Sun] Casino and related facilities, to preserve the culture, heritage and traditions of, and to promote the general welfare of . . . the Mohegan People shall continue to be harmed, all to the detriment of the [plaintiff]." The trial court concluded that the plaintiff had failed to establish that the defendant's use of those terms constituted an infringement upon the plaintiff's trade name under the Lanham Act or state common law and, therefore, rendered judgment in favor of the defendant. On appeal, the plaintiff contends that the trial court improperly: (1) denied trademark protection for the terms "Mohegan" and "Mohegan Tribe" under the Lanham Act; and (2) concluded that the defendant did not infringe on the plaintiff's name under state com-

---

found in favor of the group led by Standing Bear. That ruling, however, is not the subject of this appeal. As we have indicated, moreover, the Mohegan Tribe and Nation remains a party to this appeal.

[12] In its complaint, the plaintiff also sought to enjoin the defendant's use of the names " 'Mohegan Tribe and Nation,' " " 'The Mohegan Tribe and Nation, Inc.,' " and the " 'Confederation of the Mohegan-Pequot American Indian Nation and Affiliated Tribes, Inc.' " The parties and the trial court have treated this case as involving only the terms "Mohegan" and "Mohegan Tribe." Accordingly, we limit our review to those two names.

mon law. We disagree and, accordingly, affirm the judgment of the trial court.

## I

The plaintiff first challenges the trial court's denial of trademark protection to the terms "Mohegan" and "Mohegan Tribe" under the Lanham Act. We reject this claim.

Under the Lanham Act, it is unlawful for any person, in connection with goods, services or containers for goods, to use in commerce "any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin . . . which . . . is likely to cause confusion . . . as to the origin, sponsorship, or approval of . . . [the] goods, services, or commercial activities . . . ." 15 U.S.C. § 1125 (a) (1) (A) (1994). Therefore, to prevail on an infringement claim under the Lanham Act, a plaintiff must establish, first, "that it possesses a valid, legally protectible mark[13] and [sec-

[13] Under the Lanham Act, the term "mark" includes trademarks and service marks. 15 U.S.C. § 1127 (1994). A trademark is "any word, name, symbol, or device, or any combination thereof . . . used by a person [or entity] . . . to identify and distinguish [such person's or entity's] goods . . . from those manufactured or sold by others and to indicate the source of the goods . . . ." 15 U.S.C. § 1127 (1994). A service mark is similar to a trademark except that a service mark is applicable to services rather than goods. 15 U.S.C. § 1127 (1994).

Trade names also are protected under the Lanham Act. See, e.g., 15 U.S.C. § 1125 (c) (1) (Sup. III 1997). A trade name is "any name used by a person [or entity] to identify [that person's or entity's] business or vocation." 15 U.S.C. § 1127 (1994). "Modern usage restricts the term 'trade name' to symbols used to distinguish companies, partnerships and businesses, as opposed to marks used to identify and distinguish goods and services. That is, a 'trade name' today designates a term or symbol that denotes a business or company and its good will, while trademarks and service marks identify and distinguish goods and services [respectively]. As one court explained:

" 'A trade name is descriptive of the manufacturer or dealer himself and applies to a business and its good will, whereas a trademark, in a technical sense, is applicable to vendible commodities . . . . [A] trademark has reference to the thing sold while a trade name embraces both the thing sold and the individuality of the seller.' " 1 J. McCarthy, Trademarks and Unfair Competition (4th Ed. 1998) § 4-13, p. 4-13, quoting *Farmers' Educational &*

ond] that [a] defendant's subsequent use of a similar mark is likely to create confusion as to the origin of the [goods or services] at issue."[14] *Lane Capital Management, Inc.* v. *Lane Capital Management, Inc.*, 192 F.3d 337, 344 (2d Cir. 1999). The trial court concluded that the plaintiff had failed to satisfy either of these two requirements. We agree with the trial court that, under the facts and circumstances of this case, the plaintiff did not prove that it possesses a legally protectible interest in the terms "Mohegan" and "Mohegan Tribe" for purposes of the Lanham Act.[15]

## A

A plaintiff asserting a claim under § 43 (a) of the Lanham Act must establish that its mark is sufficiently distinctive to be worthy of protection. E.g., id., 344. In other words, "[t]o be valid and protectible, a mark must

*Cooperative Union* v. *Iowa Farmers Union*, 150 F. Sup. 422, 424 (S.D. Iowa), aff'd sub nom. *Stover* v. *Farmers' Educational & Cooperative Union*, 250 F.2d 809 (8th Cir.), cert. denied, 356 U.S. 976, 78 S. Ct. 1139, 2 L. Ed. 2d 1149 (1958).

The terms that the plaintiff seeks to protect, namely, "Mohegan" and "Mohegan Tribe," identify a particular people or tribal entity, rather than specific goods, products or services. Therefore, the trial court and the parties properly have referred to the plaintiff's claim as one involving an alleged infringement of its trade name. Any distinctions between trademarks, service marks and trade names are not material to our resolution of this appeal. Moreover, although much of the relevant Lanham Act case law deals with trademarks and service marks and, therefore, speaks in terms of goods, products or services, those cases also are applicable to this case.

[14] The term "services" under the Lanham Act has been interpreted broadly. E.g., *United We Stand America, Inc.* v. *United We Stand, America New York, Inc.*, 128 F.3d 86, 89 (2d Cir. 1997), cert. denied, 523 U.S. 1076, 118 S. Ct. 1521, 140 L. Ed. 2d 673 (1998). "The Lanham Act has thus been applied to defendants furnishing a wide variety of noncommercial public and civic benefits"; id., 90; including political organizations, nonprofit corporations, community and public service organizations, fraternal organizations and organizations engaged in the dissemination of information about various issues of interest to the public. See id., 90–91. The defendant does not dispute the fact that its commercial and noncommercial activities constitute services within the meaning of the Lanham Act.

[15] We, therefore, do not reach the likelihood of confusion requirement.

be capable of distinguishing the products [or services] it marks from those of others." Id. For purposes of determining whether a mark warrants protection under the Lanham Act, courts divide such marks "into five general categories of distinctiveness: 1) generic; 2) descriptive; 3) suggestive; 4) arbitrary; and 5) fanciful." *Genesee Brewing Co.* v. *Stroh Brewing Co.*, 124 F.3d 137, 142 (2d Cir. 1997). A term or phrase is generic when it refers to the genus of which the particular product, service or entity is a species. E.g., id., 143. In other words, "[a] generic term is one commonly used to denote a product or other item or entity, one that indicates the thing itself, rather than any particular feature or exemplification of it. . . . A generic term does not merely identify a particular characteristic or quality of some thing; it connotes the basic nature of that thing." (Citations omitted; internal quotation marks omitted.) *Blinded Veterans Assn.* v. *Blinded American Veterans Foundation*, 872 F.2d 1035, 1039 (D.C. Cir. 1989).

"A descriptive mark describes a product's features, qualities or ingredients in ordinary language . . . or describes the use to which a product is put . . . . A suggestive mark employs terms which do not describe but merely suggest the features of the product, requiring the purchaser to use imagination, thought and perception to reach a conclusion as to the nature of goods. . . . [T]he term fanciful, as a classifying concept, is usually applied to words invented solely for their use as trademarks. When the same legal consequences attach to a common word, i.e., when it is applied in an unfamiliar way, the use is called arbitrary. . . .

"Marks that are arbitrary, fanciful, or suggestive are considered inherently distinctive, and are automatically entitled to protection under the Lanham Act . . . . Marks that are descriptive are entitled to protection only if they have acquired a secondary meaning in the marketplace." (Citations omitted; internal quotation

marks omitted.) *Genesee Brewing Co.* v. *Stroh Brewing Co.*, supra, 124 F.3d 143. "Secondary meaning attaches when the name and the business have become synonymous in the mind of the public, submerging the primary meaning of the term in favor of its meaning as a word identifying that business." (Internal quotation marks omitted.) *Time, Inc.* v. *Petersen Publishing Co.*, 173 F.3d 113, 117 (2d Cir. 1999); accord *Arrow Fastener Co.* v. *Stanley Works*, 59 F.3d 384, 390 (2d Cir. 1995).

Generic terms are never entitled to trademark protection. E.g., *Nabisco, Inc.* v. *PF Brands, Inc.*, 191 F.3d 208, 215 (2d Cir. 1999); *Genesee Brewing Co.* v. *Stroh Brewing Co.*, supra, 124 F.3d 143. Such words "are totally without distinctiveness and are ineligible for protection as marks because to give them protection would be to deprive competitors of the right to refer to their [product or entity] by name." *Nabisco, Inc.* v. *PF Brands, Inc.*, supra, 215; see also *Duraco Products, Inc.* v. *Joy Plastic Enterprises, Ltd.*, 40 F.3d 1431, 1442 (3d Cir. 1994) ("[w]hat is generic in trademark law is a word with so few alternatives [perhaps none] for describing the good [or entity] that to allow someone to monopolize the word would debilitate competitors" [internal quotation marks omitted]). "[N]o matter how much money and effort the user of a generic term has poured into promoting the sale of its merchandise and what success it has achieved in securing public identification, it cannot deprive competing manufacturers of the product of the right to call an article by its name."[16] *Aber-*

---

[16] Of course, in classifying a trademark on the spectrum of distinctiveness, "a court examines the context in which the words constituting the mark are used. . . . [Thus] 'the word "apple" would be arbitrary when used on personal computers, suggestive when used in "Apple-A-Day" on vitamin tablets, descriptive when used in "Tomapple" for combination tomato-apple juice and generic when used on apples.' " (Citations omitted.) *Paddington Corp.* v. *Attiki Importers & Distributors, Inc.*, 996 F.2d 577, 583 (2d Cir. 1993); accord *Bristol-Myers Squibb Co.* v. *McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1041 (2d Cir. 1992). Therefore, "[i]t is well-established that [a] word may be generic of some things and not of others. . . . To take a familiar example, Ivory would be generic when used to describe a product made

*crombie & Fitch Co.* v. *Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976); accord *Papercutter, Inc.* v. *Fay's Drug Co.*, 900 F.2d 558, 562 (2d Cir. 1990).

We note, moreover, that "[t]he classification of a mark is a factual question. . . . The factual issue presented is how the purchasing public views the mark. The fact-finder is not the designated representative of the purchasing public, and the fact-finder's own perception of the mark is not the object of the inquiry. Rather, the fact-finder's function is to determine, based on the evidence before it, what the perception of the purchasing public is." (Citation omitted.) *Lane Capital Management, Inc.* v. *Lane Capital Management, Inc.*, supra, 192 F.3d 344. Therefore, "[w]e will substitute our own judgment on the matter for that of the [trial] court only if the [trial] court's determination is clearly erroneous." *Bristol-Myers Squibb Co.* v. *McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1040 (2d Cir. 1992); accord *Genesee Brewing Co.* v. *Stroh Brewing Co.*, supra, 124 F.3d 144.

Finally, in cases involving trademarks that have been registered with the United States Patent and Trademark Office, a presumption of validity attaches to the mark and, consequently, the burden of proving genericness in an infringement action falls upon the defendant.[17] See, e.g., *Harley-Davidson, Inc.* v. *Grottanelli*, 164 F.3d 806, 811 (2d Cir. 1999); *Reese Publishing Co.* v. *Hampton International Communications, Inc.*, 620 F.2d 7, 11 (2d Cir. 1980). "But where, as [in the present case], the mark is not registered,[18] this presumption of validity

---

from the tusks of elephants but arbitrary as applied to soap." (Citation omitted; internal quotation marks omitted.) *Genesee Brewing Co.* v. *Stroh Brewing Co.*, supra, 124 F.3d 147.

[17] The Lanham Act protects marks that have been registered with the United States Patent and Trademark Office as well as marks that have not been registered. See *Banff, Ltd.* v. *Federated Dept. Stores, Inc.*, 841 F.2d 486, 489 (2d Cir. 1988). The plaintiff has not sought to register either the term "Mohegan" or the term "Mohegan Tribe."

[18] See footnote 17 of this opinion.

does not come into play. Instead, the burden is on the plaintiff to prove that its mark . . . is not generic." (Citations omitted.) *Reese Publishing Co.* v. *Hampton International Communications, Inc.*, supra, 11.

## B

With these principles in mind, we turn to the merits of the plaintiff's claim. The trial court concluded that the terms "Mohegan" and "Mohegan Tribe" are generic and, consequently, that they are not entitled to trademark protection.[19] The plaintiff contends that those terms are arbitrary or, in the alternative, either suggestive or descriptive. We agree with the trial court.[20]

At trial, the defendant claimed that it has the right to use the word "Mohegan" in its name because "Mohegan" is a generic term that refers to all Native Americans of Mohegan descent. Though not conclusive proof of a mark's generic nature, dictionary definitions of a word are significant evidence of genericness because "they usually reflect the public's perception of a word's meaning and its contemporary usage." *Harley-Davidson, Inc.* v. *Grottanelli*, supra, 164 F.3d 810. As we have indicated; see footnote 6 of this opinion; the term "Mohegan" is defined as "a member of the Mohegan people" and "an Indian people of southeastern

---

[19] We note that the trial court's memorandum of decision is not a model of clarity on this point. The memorandum consists largely of a series of contradictory assertions, apparently lifted verbatim and without attribution from the parties' posttrial briefs. Unfortunately, it is difficult in many instances to ascertain the court's findings and legal conclusions, especially with respect to the issue of the protectibility of the terms "Mohegan" and "Mohegan Tribe." Moreover, the parties failed to seek an articulation by the trial court. In its brief to this court, however, the plaintiff characterizes the trial court's decision as "holding that the names ['Mohegan' and 'Mohegan Tribe'] are generic . . . ." We also adopt that reading of the court's decision.

[20] On appeal, the parties have failed to identify any case under the Lanham Act, and we have found none, in which the word or term for which trademark protection was sought is, as in this case, a term used by a defendant to identify its nationality, ethnicity or ancestry.

Connecticut." Webster's Third New International Dictionary. As these definitions reflect, "Mohegan" is a generic term, that is, a term relating to or characteristic of a whole group or class, that may be used by any person of Mohegan heritage to identify himself or herself as a member of that particular group of Native American people. Indeed, a person of Mohegan ancestry cannot be deprived of the right to call himself or herself Mohegan, for there is no other term that can be used to refer to that unique and distinct ancestral group.[21] See *Genesee Brewing Co.* v. *Stroh Brewing Co.*, supra, 124 F.3d 145 ("[a]t the least, if no commonly used alternative effectively communicates the same functional information, the term that denotes the product is generic"). Thus, just as a "word may . . . be generic by virtue of its association with a particular region, cultural movement, or legend"; *Otokoyama Co. Ltd.* v. *Wine of Japan Import, Inc.*, 175 F.3d 266, 271 (2d Cir. 1999); so may a word be generic when, as in the present case, it denotes a person or people of a particular heritage or nationality. See *Filipino Yellow Pages, Inc.* v. *Asian Journal Publications, Inc.*, 198 F.3d 1143, 1147 (9th Cir. 1999) ("[T]he parties [to this Lanham Act case] do not dispute that 'Filipino' . . . [is a] generic [term]. The word 'Filipino' is a clearly generic term used to refer to 'a native of the Philippine islands' or 'a citizen of the Republic of the Philippines.' Webster's Ninth New Collegiate Dictionary 462 [1986].").

The word "tribe" also is generic in the context presented by this case. "Tribe" is the term commonly, if not exclusively, used to refer to a group or community of Native Americans who share a common heritage,

---

[21] Indeed, the plaintiff conceded at oral argument that it cannot prohibit individual members of the defendant from holding themselves out to the public as Mohegans.

history, culture and geography.[22] Indeed, it is difficult to imagine a term other than "tribe" to describe a particular group or community of Indians whose members, by virtue of their long-standing association and shared culture and ancestry, wish to identify themselves as part of that group or community.[23]

Clearly, the terms "Mohegan" and "tribe" are generic. In evaluating whether the two words taken together are generic, however, we look to the term as a whole rather than to its constituent or component parts individually.[24] E.g., *Committee for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 821 (9th Cir. 1996); *Berner International Corp. v. Mars Sales Co.*, 987 F.2d 975, 981 (3d Cir. 1993); see *Reese Publishing Co. v. Hampton International Communications, Inc.*, supra, 620 F.2d 11 n.1. The term "Mohegan Tribe," like its component parts, is generic because it denotes a distinctive and identifiable group of Native Americans of Mohegan ancestry. Indeed, there is no other way to refer to a community

[22] "Tribe" is defined as "an endogamous social group held to be descended from a common ancestor and composed of numerous families, exogamous clans, bands, or villages that occupies a specific geographic territory, possesses cultural, religious, and linguistic homogeneity, and is commonly united politically under one head or chief . . . ." Webster's Third New International Dictionary.

[23] We do not mean to suggest that, for purposes of the Lanham Act, *any* entity that wishes to identify itself as a Mohegan tribe may do so. When viewed in the context of this case; see *Paddington Corp. v. Attiki Importers & Distributors, Inc.*, 996 F.2d 577, 583 (2d Cir. 1993); the term "Mohegan tribe" is generic, and, therefore, not entitled to protection under the Lanham Act, because it is the term used to refer to a tribal unit comprised of Native Americans of Mohegan ancestry. An entity that, for example, has no colorable claim of Mohegan tribal status presumably could be enjoined from identifying itself as a Mohegan tribe under the Lanham Act upon a showing of likelihood of confusion as to the source of the entity's products or services.

[24] Indeed, it may be possible for a mark comprised solely of generic words to be descriptive, rather than generic, when the mark is considered in its entirety. See, e.g., *Filipino Yellow Pages, Inc. v. Asian Journal Publications, Inc.*, supra, 198 F.3d 1148–51; *W.W.W. Pharmaceutical Co. v. Gillette Co.*, 984 F.2d 567, 572 (2d Cir. 1993); cf. *Blinded Veterans Assn. v. Blinded American Veterans Foundation*, supra, 872 F.2d 1041.

of Native Americans of that particular ancestry; simply put, a Mohegan tribe must be permitted to describe itself as such because that is what it is.[25]

The plaintiff nevertheless claims that the defendant should be prohibited from referring to itself as a

[25] We reject the plaintiff's claim that the term "Mohegan" is arbitrary or, in the alternative, either suggestive or descriptive. "An arbitrary term is one that has a dictionary meaning—*though not describing the product [or entity]*—like IVORY for soap." (Emphasis added.) *Gruner + Jahr USA Publishing* v. *Meredith Corp.*, 991 F.2d 1072, 1075–76 (2d Cir. 1993). The plaintiff asserts that the term "Mohegan" is arbitrary because it means wolf, as opposed to an Indian tribe, in the Algonquin family of languages. See footnote 6 of this opinion. The plaintiff appears to claim that the so-called "doctrine of foreign equivalents" applies to the term "Mohegan." "Under the doctrine of foreign equivalents, foreign words are translated into English and then tested for descriptiveness or genericness." (Internal quotation marks omitted.) 2 J. McCarthy, Trademarks and Unfair Competition (4th Ed. 1999) § 11:34, p. 11-60; see also *Otokoyama Co. Ltd.* v. *Wine of Japan Import, Inc.*, supra, 175 F.3d 271. That doctrine, however, is not applicable in cases in which an appreciable number of members of the general public are unlikely to be conversant in the language from which the word originates, and when the word has a commonly accepted meaning in the English language. See 2 J. McCarthy, supra, § 11:34, p. 11-60.1 ("[f]oreign words from dead languages such as Classical Greek, or from obscure languages such as those of the Hottentots or Patagonians or the Taino Indians of the Dominican Republic, might be so unfamiliar to any segment of the American buying public that they should not be translated into English for descriptive purposes"). The doctrine of foreign equivalents is not applicable in the present case inasmuch as no sizable segment of the relevant public is likely to speak the Algonquin languages and, as the dictionary definition of "Mohegan" reflects; see footnote 6 of this opinion; the word has become synonymous in the English language with the unique Indian people commonly known by that name. Consequently, "Mohegan" does not qualify as an arbitrary term for purposes of the Lanham Act.

In addition, "Mohegan" is not a suggestive or descriptive term. A suggestive mark is one that suggests the product, service or entity, but requires thought and imagination to understand the nature of that product, service or entity. *Time, Inc.* v. *Petersen Publishing Co.*, supra, 173 F.3d 118; *Estee Lauder, Inc.* v. *The Gap, Inc.*, 108 F.3d 1503, 1509 (2d Cir. 1997). A mark is classified as descriptive if it describes a product's features, qualities or characteristics, or describes the use to which the product is put. See *Genesee Brewing Co.* v. *Stroh Brewing Co.*, supra, 124 F.3d 143; see also *Estee Lauder, Inc.* v. *The Gap, Inc.*, supra, 1509. The term "Mohegan" is neither suggestive nor descriptive because it does not suggest or describe anything; rather, it *denotes* those Native Americans of Mohegan ancestry.

Mohegan tribe because the plaintiff, unlike the defendant, has received federal acknowledgment. In essence, this argument boils down to a claim that only the plaintiff may hold itself out as a Mohegan tribe because it alone has received federal acknowledgment. We are not persuaded by this contention. As we have indicated, the application of the Mohegan Tribe and Nation for acknowledgment by the Bureau of Indian Affairs is pending, and the plaintiff conceded at oral argument that the Mohegan Tribe and Nation yet may be successful in achieving such acknowledgment.[26] Thus, the fact that the plaintiff already has received federal acknowledgment does not, by itself, preclude the Mohegan Tribe and Nation from achieving that goal as well. Indeed, if it were true that the plaintiff's receipt of federal acknowledgment automatically disqualified any other group from attaining acknowledgment as a Mohegan tribe, then the application of the Mohegan Tribe and Nation to the Bureau of Indian Affairs would have been rejected summarily upon filing.[27] Thus, the plaintiff has not established that it necessarily is the sole group or community of Native Americans residing in southeastern Connecticut that legitimately may lay claim to status as a Mohegan tribe.[28]

---

[26] Although the plaintiff maintains that it is unlikely that the Mohegan Tribe and Nation will achieve federal acknowledgment, the plaintiff concedes that such acknowledgment remains a possibility.

[27] We note, moreover, that one of the plaintiff's witnesses testified that the Mohegan Tribe and Nation has received several federal grants to assist in its research efforts relative to its application for federal acknowledgment.

[28] The plaintiff also notes that it has received state recognition and the defendant has not. This point, though correct, is unavailing, for there is nothing in the record to indicate that the defendant necessarily is barred from seeking and, perhaps, achieving such recognition in the future. Indeed, it is noteworthy that the state has recognized two separate Indian tribes of Pequot heritage, namely the Mashantucket Pequot Tribe and the Paucatuck Eastern Pequot Tribe, which reside in the adjacent towns of Ledyard and North Stonington, respectively. See General Statutes § 47-59a (b); see also General Statutes § 47-63.

In light of the trial court's factual findings, we also are unwilling to conclude that the defendant may not refer to itself as what it claims to be, namely, a Mohegan tribe. The evidence supports the trial court's finding that the lineage of the defendant's incorporators and membership may be traced to deceased Mohegan tribal leaders[29] and, in addition, that, for decades, the defendant and its predecessor entity have held themselves out to the public as a Mohegan tribe and have engaged in activities consistent with such tribal status. Contrary

[29] The plaintiff challenges the relevance of this factual finding, and also claims that: (1) it had no notice that the trial court intended to address this issue; (2) the issue was irrelevant; (3) the finding was not supported by the evidence; and (4) the trial court lacked authority to make such a finding. We reject each of these claims. With respect to the plaintiff's relevancy and notice claims, the plaintiff alleged in its complaint, and the defendant acknowledged in its answer, that a group of individuals claiming to be Mohegan Indians formed the Mohegan Tribe and Nation. Moreover, the plaintiff consistently has maintained that the defendant has no right to identify itself as a Mohegan tribal entity. In such circumstances, the ancestry of the defendant's incorporators and members pertains directly to the plaintiff's contention, vigorously disputed by the defendant, that the plaintiff is the only legitimate Mohegan tribe in southeastern Connecticut. For the same reasons, the defendant cannot establish that it lacked notice that the ancestry of the incorporators and members of the defendant was at issue in this case.

With respect to the plaintiff's claim of evidentiary insufficiency, several persons affiliated with the defendant testified as to their Mohegan heritage, including Fortin, an incorporator of the Mohegan Tribe and Nation. We see no reason why the trial court could not have credited the testimony of those witnesses. Finally, the plaintiff asserts that the trial court lacked jurisdiction to consider issues relating to Mohegan ancestry because the plaintiff, as the only Mohegan tribe in southeastern Connecticut to have achieved federal acknowledgment, alone is vested with the authority to determine who, by ancestry, is entitled to Mohegan tribal membership. Although we agree that tribal membership generally is a question to be determined by the tribe itself; see, e.g., *Montana* v. *United States*, 450 U.S. 544, 564, 101 S. Ct. 1245, 67 L. Ed. 2d 493 (1981) (Indian tribes have inherent power to determine tribal membership); the issue raised by this appeal is not whether members of the defendant are entitled to membership in the plaintiff, but, rather, whether the plaintiff has established that the defendant should be enjoined from using the terms "Mohegan" and "Mohegan Tribe" in its name. The trial court's factual findings support the defendant's contention that, for purposes of this case, it may refer to itself as a Mohegan tribe.

to the plaintiff's claim, we are persuaded that these findings are sufficient to support the conclusion that, at least in the context of this case, the defendant should not be precluded from identifying itself as a Mohegan tribe.[30] We, therefore, conclude that the trial court properly concluded that the plaintiff failed to shoulder its burden of proving that the defendant is prohibited, under the Lanham Act, from holding itself out to the public as a Mohegan tribe.[31]

## II

The plaintiff also claims that it is entitled to relief under common-law principles of unfair competition. We disagree.

Under our common law, "[a] trade name will be protected but not until it has in fact become in the market

---

[30] We, of course, intimate no view as to whether the defendant legitimately may claim Mohegan tribal status for any other purpose.

[31] We note that the Lanham Act "has been construed to prohibit misrepresenting the source of a product either (i) by passing off, in which *A* sells its product under *B*'s name, or (ii) by reverse passing off, in which *A* sells *B*'s product under *A*'s name." (Emphasis added; internal quotation marks omitted.) *Attia* v. *Society of the New York Hospital*, 201 F.3d 50, 59 (2d Cir. 1999). Such misrepresentations regarding the source of a product are actionable under the Lanham Act even in circumstances in which the plaintiff's mark is found to be generic and, consequently, not otherwise entitled to protection under the act. *Forschner Group, Inc.* v. *Arrow Trading Co.*, 30 F.3d 348, 357 (2d Cir. 1994). "[A] phrase or term that is indeed generic is not without protection under § 43 (a) of the Lanham Act . . . . A judicial finding of genericness means only that courts will not recognize exclusive rights in the use of the generic phrase or term or impose trademark infringement liability upon subsequent users; such a finding does not close all avenues of relief. A manufacturer, for example, cannot use a generic term in a manner that constitutes a misrepresentation of manufacturer or source." Id. Because the plaintiff did not distinctly raise either a passing off or reverse passing off claim, we do not address the issue. We note, however, that the plaintiff did allege, in connection with its trademark infringement claim, that the defendant sought to trade on the plaintiff's reputation by engaging in conduct intended to give the impression to the public that the Mohegan Tribe and Nation was, in fact, the federally acknowledged Mohegan tribe located in southeastern Connecticut. Thus, it is apparent that the trial court discredited the evidence adduced by the plaintiff in support of this allegation.

the name for goods or services coming from or through a particular source or the name for a particular business. This special significance, once acquired, is thereafter its primary meaning in the market, though lexicographically it may have an earlier, different meaning." (Internal quotation marks omitted.) *Shop-Rite Durable Supermarket, Inc.* v. *Mott's Shop Rite*, 173 Conn. 261, 266, 377 A.2d 312 (1977).

However, "[n]o inflexible rule can be laid down as to what use of names will constitute unfair competition; this is a question of fact. The question to be determined is whether or not, as a matter of fact, the name is such as to cause confusion in the public mind as between the plaintiff's business and that of the defendant, resulting in injury to the plaintiff. The test is whether the public is likely to be deceived. . . . If the court finds that the effect of appropriation by one corporation of a distinctive portion of the name of another is to cause confusion and uncertainty in the latter's business, injure them pecuniarily and otherwise, and deceive and mislead the public, relief will be afforded. . . . It is not sufficient that some person may possibly be misled but the similarity must be such that any person, with such reasonable care and observation as the public generally [is] capable of using and may be expected to exercise, would be likely to mistake one for the other."[32] (Internal quotation marks omitted.) Id., 265–66; accord *Yale Cooperative Corp.* v. *Rogin*, 133 Conn. 563, 571, 53 A.2d 383 (1947); *Middletown Trust Co.* v. *Middletown National Bank*, 110 Conn. 13, 20–21, 147 A. 22 (1929).

In the present case, the trial court found that the plaintiff had not proven that the public was likely to be

---

[32] We note that a defendant's use of a generic term may be actionable under common-law principles of unfair competition when, for example, that defendant uses a generic term in a manner that constitutes a misrepresentation of the source of the defendant's product or service. See, e.g., *Forschner Group, Inc.* v. *Arrow Trading Co.*, 30 F.3d 348, 357 (2d Cir. 1994).

confused by the defendant's use of the terms "Mohegan" and "Mohegan Tribe." Consistent with that finding, the trial court concluded that the plaintiff failed to establish that it had been injured in any way as a result of the defendant's use of those terms.

At trial, the plaintiff sought to establish that the defendant's use of the terms "Mohegan" and "Mohegan Tribe" caused confusion among members of the public. The plaintiff further sought to prove that this confusion was harmful because it had resulted in the dilution of the plaintiff's trade name and had caused the plaintiff to lose a measure of control over the use of that name. In support of these claims, the plaintiff adduced testimony that: a Montville automobile dealer who had purchased advertising space in a brochure published by the defendant in connection with its annual "powwow" mistakenly believed that he was dealing with the plaintiff; the defendant regularly received telephone calls from persons seeking to locate the plaintiff or the Mohegan Sun Casino; and a public school that had intended to invite the plaintiff to make a presentation about Mohegan culture and history mistakenly contacted the defendant about doing so instead.

Finally, the plaintiff also sought to establish that the defendant intentionally misled members of the public by holding itself out to be the federally acknowledged Mohegan tribe. In support of this claim, the plaintiff elicited testimony from several witnesses indicating that Standing Bear and others affiliated with the defendant had failed to distinguish sufficiently the defendant from the plaintiff in its dealings with the public.

Although the defendant did not challenge the plaintiff's evidence regarding the apparent confusion surrounding the school presentation and the automobile dealer's purchase of advertising space in the defendant's brochure, the defendant vigorously contested the

plaintiff's claim regarding the telephone calls and the allegation that it intentionally misled the public as to its identity. Indeed, several of the defendant's members, including Standing Bear, testified that on the infrequent occasions that the defendant received telephone calls from persons trying to reach the plaintiff, those callers immediately were referred to the plaintiff. Those witnesses also testified that neither the defendant nor its members ever attempted to mislead the public regarding its identity.

The trial court concluded that the plaintiff's evidence was insufficient to establish that confusion was likely to result from the defendant's continued use of the terms "Mohegan" and "Mohegan Tribe." The court also found that the plaintiff failed to "demonstrate any harm to itself or its business," and that "the activities of the [defendant] pose no danger to the plaintiff, nor do they in any way interfere with the activities of the casino."[33] In so finding, the trial court noted that the plaintiff and the defendant are not in commercial competition with one another; as the court stated, the plaintiff's main business venture is the Mohegan Sun Casino, whereas the defendant's only commercial activity is the sale of arts and crafts.[34] The trial court further found that in those areas in which the activities of the plaintiff and defendant overlap, namely, their annual powwows and presentations to schools and civic organizations about Mohegan culture and history, the plaintiff failed to prove that the defendant's use of the terms "Mohegan" and "Mohegan Tribe" had caused any significant actual

---

[33] The trial court also noted that a contrary conclusion "would crush [the defendant's] pride and dignity in [its] heritage."

[34] Indeed, the plaintiff conceded at oral argument that the defendant's activities have not caused it any pecuniary loss whatsoever. For purposes of this appeal, however, we assume, arguendo, that the harm allegedly suffered by the plaintiff as a result of the defendant's use of the terms "Mohegan" and "Mohegan Tribe" is of a kind that falls within the purview of the common-law tort of unfair competition.

confusion among the public. Finally, the court concluded that the plaintiff did not prove that the defendant's continued use of those terms was likely to cause such confusion in the future.[35]

"[W]here the factual basis of the [trial] court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . . It is not our function to retry cases." (Citation omitted; internal quotation marks omitted.) *Vallerie* v. *Stonington*, 253 Conn. 371, 373, 751 A.2d 829 (2000). Contrary to the plaintiff's claim, the evidence, and lack thereof, supports the trial court's conclusion that the plaintiff failed to meet its burden of proving that the defendant's use of the terms "Mohegan" and "Mohegan Tribe" is likely to cause confusion among the public and thereby cause harm to the plaintiff. Consequently, the court's decision to reject the plaintiff's claim of unfair competition is not clearly erroneous. That claim, therefore, must fail.

The judgment is affirmed.

In this opinion the other justices concurred.

---

[35] It is implicit in the trial court's findings that the court rejected the plaintiff's claim that the defendant had held itself out as the federally acknowledged Mohegan tribe in southeastern Connecticut.