[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON POST-VERDICT MOTIONS
This matter comes before the court in connection with four post-verdict motions filed by the parties. The plaintiff filed her motion to set aside the verdict and for a new trial, or for additur (#113) (the motion to set aside)[1] her motion for double damages and double costs and counsel fees (#112) (motion for costs); and her motion for special finding, dated August 22, 2002. The defendants filed objections to each of these motions. The defendants filed a motion for hearing on collateral source reductions (#111). The court heard the motions on October 28, 2002.[2]
The court now issues this memorandum of decision. For the reasons set forth below, the court denies the plaintiff's motions. In addition, the court denies the defendants' motion for collateral source reductions.
 I. Background
The return date in this matter was May 30, 2000. On July 30, 2002, after three days of trial, the jury rendered a verdict for the plaintiff, awarding $7,500.00 in economic damages and zero noneconomic damages. The plaintiff's claims stemmed from a motor vehicle accident which occurred in Middletown, Connecticut on May 9, 1998. The plaintiff, who was then the driver of an automobile, was stopped for a red light on Main Street, when her vehicle was struck from behind by another vehicle driven by Charles E. Curtiss, V, one of the defendants (Curtiss vehicle). She claimed that the accident caused her to suffer personal injuries and other damages. While, at trial, the defendants[3] admitted that Charles E. Curtiss, V's negligence caused the accident, the damages claims were contested. The plaintiff contends that the jury's verdict was inadequate, shocking, and punitive. Additional facts are discussed below.
 II. Motion To Set Aside
"When considering a motion to set aside the verdict, this court's function is to `determine whether the evidence, viewed in the light most CT Page 14190 favorable to the prevailing party, reasonably supports the jury's verdict.' (Internal quotation marks omitted.) Skrypiec v. Noonan,228 Conn. 1, 10, 633 A.2d 716 (1993)." Preston v. Wellspeak,62 Conn. App. 77, 81, 767 A.2d 1259 (2001). "A trial court may set aside a verdict on a finding that the verdict is manifestly unjust because, given the evidence presented, the jury mistakenly applied a legal principle or because there is no evidence to which the legal principles of the case could be applied." Card v. State, 57 Conn. App. 134, 138,747 A.2d 32 (2000).
"Before determining whether the granting of a motion to set aside is proper, the trial court must look at the relevant law that it gave the jury to apply to the facts, and at the facts that the jury could have found based on the evidence. The law and evidence necessarily define the scope of the trial court's legal discretion. . . . This discretion vested in the trial court is not an arbitrary or capricious discretion, but rather, it is legal discretion to be exercised within the boundaries of settled law. . . . This limitation on a trial court's discretion results from the constitutional right of litigants to have issues of fact determined by a jury. . . . The trial court, upon a motion to set aside the verdict, is called on to question whether there is a legal reason for the verdict and, if there is not, the court must set aside the verdict." (Citations omitted; internal quotation marks omitted.) Suarez v. Sordo,43 Conn. App. 756, 759-60, 685 A.2d 1144 (1996), cert. denied,240 Conn. 906, 688 A.2d 334 (1997).
"[T]he constitutional right of trial by jury includes the right to have issues of fact as to which there is room for a reasonable difference of opinion among fair-minded men passed upon by the jury and not by the court." (Internal quotation marks omitted.) Rejouis v. Greenwich Taxi,Inc., 57 Conn. App. 778, 783, 750 A.2d 501, cert. denied, 254 Conn. 906,755 A.2d 882 (2000). "[I]f there is a reasonable basis in the evidence for the jury's verdict, unless there is a mistake in law or some other valid basis for upsetting the result other than a difference of opinion regarding the conclusions to be drawn from the evidence, the trial court should let the jury work their will." (Internal quotation marks omitted.)Wichers v. Hatch, 252 Conn. 174, 189, 745 A.2d 789 (2000).
"The amount of damages awarded is a matter peculiarly within the province of the jury. . . ." (Internal quotation marks omitted.) Weiss v.Bergen, 63 Conn. App. 810, 813, 779 A.2d 195, cert. denied, 258 Conn. 908,782 A.2d 1254 (2001). "The only practical test to apply to a verdict is whether the award of damages falls somewhere within the necessarily uncertain limits of fair and reasonable compensation in the particular case, or whether the verdict so shocks the sense of justice as to compel CT Page 14191 the conclusion that the jury [was] influenced by partiality, mistake or corruption." (Internal quotation marks omitted.) Parasco v. AetnaCasualty Surety Co., 48 Conn. App. 671, 675-676, 712 A.2d 433
(1998). "A fact finder is not required to award noneconomic damages simply because economic damages are awarded." Id., 676.
"The Supreme Court [has] measured the discretion of a trial court in ruling on a motion for additur, considering whether (1) the jury award shocks the conscience; (2) the plaintiff who has proved substantial injuries is awarded inadequate damages; and (3) whether or not the verdict is inherently ambiguous." Nesto v. Vinci, Superior Court, judicial district of New Haven at Meriden, Docket No. 97-025 8075 S (January 27, 1999, Dorsey, J.T.R.) (citing Childs v. Bainer, 235 Conn. 107,114-115, 663 A.2d 398 (1995).
In the motion to set aside, the plaintiff asserts that the jury's verdict was based on "uncontested evidence at trial," and should be set aside as the jury "could not have reasonably and legally reached their conclusion based on this evidence." Motion To Set Aside, p. 5. The plaintiff also contends that the jury's award of no noneconomic damages is inconsistent with its award of $7,500.00 in economic damages. See Motion To Set Aside, p. 10.
Our Supreme Court has stated that a jury verdict which awards economic damages, but no noneconomic damages, is not per se contrary to law. "Rather than decide that an award of only economic damages is inadequate as a matter of law, the jury's decision to award economic damages and zero noneconomic damages is best tested in light of the circumstances of the particular case before it. Accordingly, the trial court should examine the evidence to decide whether the jury reasonably could have found that the plaintiff had failed in his proof of the issue. That decision should be made, not on the assumption that the jury made a mistake, but, rather, on the supposition that the jury did exactly what it intended to do." (Footnote omitted.) Wichers v. Hatch, supra,252 Conn. 188-189.
Recent decisions of our appellate courts provide guidance as to how to evaluate the evidence. For example, in Wichers v. Hatch, supra, the court upheld the verdict of zero noneconomic damages where the evidence before the jury reasonably could have led it to find that, after the accident, the plaintiff saw his chiropractor more frequently than usual, "but that the accident did not cause him actually to suffer greater pain than he already had experienced as a result of his preexisting condition. Certainly, the jury reasonably could have found that the accident had not aggravated the plaintiff's condition, and that his pain was the same as CT Page 14192 what he had experienced before his accident with the defendant." Id.,252 Conn. 189-190.
Subsequently, in Schroeder v. Triangulum Associates, 259 Conn. 325,333, 789 A.2d 459 (2002), the Supreme Court, based on facts which the court termed to be in "stark contrast" to those in Wichers, the jury awarded the plaintiff $750,000 in economic damages, which amounted to "virtually all of his claimed economic damages," id. at 332, and zero noneconomic damages. The evidence included the following: "The plaintiff's physician testified that the plaintiff underwent a surgical procedure to fuse a portion of his spine. This procedure involves the removal of two spinal discs, followed by the removal of bone from the spinal column. The removed bone is then forced into the empty space in the spinal column, where over time it fuses with the surrounding bone and becomes part of the spinal column. The physician further testified that the plaintiff suffered a 30 percent permanent partial disability as a result of this significant injury." (Footnote omitted.) Id., 331.
The Supreme Court found that "[i]t is not reasonable for the jury to have found the defendant liable for the expense of the spinal fusion surgery, but not liable for the pain and permanent disability necessarily attendant to such intrusive surgery. Under these circumstances, the jury reasonably could not have found the defendant to be responsible initially for the full amount of the plaintiff's economic damages, but not liable for any noneconomic damages." Id., 332.
More recently, our Appellate Court, in Santa Maria v. Klevecz,70 Conn. App. 10, 800 A.2d 1186 (2002), affirmed a denial of a motion to set aside after a jury verdict which awarded the plaintiff substantially less than her claimed economic damages, and no noneconomic damages, based on credibility. The court found "that it was reasonable for the jury to conclude that the plaintiff's alleged pain and suffering was, at a minimum, exaggerated." Id., 15. Among the factors leading to this assessment was that "[t]he jury also heard testimony that the plaintiff previously had injured herself in a slip and fall. It was reasonable therefore for the jury to conclude that the fall or other stressors were at least partially responsible for the plaintiff's alleged pain and suffering." (Footnote omitted.) Id., 16.
In support of her argument that the jury's award of zero noneconomic damages is shocking, the plaintiff cites the evidence concerning the severity of the impact when the vehicles collided. Motion To Set Aside, p. S. She relies also on the evidence of her claimed injuries, in particular on medical reports. She asserts that "all treating doctor's opinions and reports were consistent." Motion To Set Aside, p. 6. CT Page 14193
At trial, the plaintiff testified about another suit which she filed in 1999, concerning a previous claim of injury to her lower back in a June, 1997 accident, and in which she was represented by the same attorney who represents her in this action. Also, there were inconsistencies in what she reported to health care professionals about her medical history. These issues were extensively explored before the jury. The jury reasonably could have found from this evidence that her credibility was effectively challenged at the trial. The jury reasonably could have relied on such evidence in concluding that her testimony about her pain and suffering as a result of the May, 1998 accident, and her reports of the same to health care providers, were not credible.
In her direct testimony, the plaintiff claimed injuries to her lower back, with various consequences, which she attributed to the May 9, 1998 accident.[4] These alleged consequences included, for example, continuing pain and an impairment in her ability to lift. She contended that this impairment prevented her from becoming a certified nurse's assistant (CNA) and from being able to fully perform duties as a home health aide. She also complained of sleeplessness, and of difficulty sitting for a long period of time, also attributed to the accident. She presented claims for medical expenses, including physical therapy; for lost wages; for lost earning capacity; and for future medical expenses. She asserted that she had suffered a permanent, partial disability.
On cross-examination, she stated that she had been employed as a child care worker, at the time of her prior motor vehicle accident, June 3, 1997. As results of that accident, she claimed that she injured her back, including her lower back; her neck; and her left shoulder. She acknowledged that she claimed that she had had problems with lifting and sleeplessness as a result of that accident. Medical records of her treatment reflect these complaints. See Plaintiff's Exhibit 11. The plaintiff asserted that these, and all other consequences of that accident, had been resolved by August, 1997 or soon thereafter. By that time, she stated, she knew that she had suffered no permanent disability as a result of the June, 1997 accident. She claimed to have been completely recovered before the May, 1998 accident. She also claimed to have hurt her back in August, 1997 when she went to lift a box at a prior job, but did not go to physical therapy for that.
Defendants' Exhibit A is the plaintiff's complaint in her other suit, dated May 26, 1999 (the "prior complaint"), a little over one year after the date of the accident which is the subject of the plaintiff's claims against the defendants here, May 9, 1998. Statements in a prior complaint "may be considered as evidential admissions by the party making them." CT Page 14194 (Emphasis omitted and internal quotation marks omitted.) Ferreira v.Pringle, 255 Conn. 330, 345, 346, 766 A.2d 400 (2001); see Drier v.Upjohn Co., 196 Conn. 242, 244, 492 A.2d 164 (1985). "The time has passed when allegations in a pleading will be treated as mere fictions, rather than as statements of the real issues in the [case] and hence as admissions of the parties." (Internal quotation marks omitted.) Ferreirav. Pringle, supra, 255 Conn. 346.
In the prior complaint, the plaintiff alleged that on June 3, 1997 she was in a vehicle traveling westbound on Washington Street (Route 66) in Middletown, when the defendant, Wallace E. Lawrence, struck her vehicle, "with great force and violence." Exh. A, prior complaint, first count, ¶ 3. In contrast to her trial testimony about the 1997 accident, she contended, in the prior complaint, that, as a result, she suffered bodily injuries, "some or all of which may be permanent." Exh. A, prior complaint, first count, ¶ 5.
In paragraph 6, she claimed that she "has incurred and will incur expenses for medical care and attention, medicine, physical therapy, x-rays, etc. and has been and will be unable to perform her recreational duties as she did prior to said occurrence, all of which has and will cause her loss and damage." Also, in paragraph 7 of the first count, she added that she had suffered a severe shock to her nervous system and "has suffered and will suffer pain, mental anguish, and nervousness, some of which injuries of [sic] the effects thereof, are, or are likely to be permanent."
In this case, she claims permanent injury to her back, which she attributes solely to the May, 1998 accident. As noted, at trial, she asserted that she knew, well in advance of the May, 1998 accident, that she had fully recovered from the June, 1997 accident and that she suffered no permanent injury as a result of it. Thus, the jury reasonably could have concluded that the plaintiff's own May, 1999 prior complaint contradicted her trial testimony and, thereby, impeached her credibility.
In addition, the jury was not bound to accept at face value the medical reports which the plaintiff presented. See State v. Madera, 210 Conn. 22,38, 554 A.2d 263 (1989). The jury reasonably could have concluded that the plaintiff was not truthful in her reporting to health care professionals. In Plaintiff's Exhibit 3, medical records from Middlesex Hospital, to which the plaintiff was taken after the May, 1998 accident, the emergency department report describes the plaintiff's then-current complaint of low back pain. Under "past medical history," the report reflects that the plaintiff reported a history of having Crohn's CT Page 14195 disease, but it mentions nothing about her prior accident and the low back pain allegedly caused by it. Instead, it mentions that the plaintiff was then presently complaining "mostly of low back pain." Exhibit 3, p. 1.
The jury reasonably could have concluded that the plaintiff's omission of previous low back pain from her history led to a "Discharge Impression" of "[m]otor vehicle accident with acute low back strain," Exhibit 3, p. 2, which did not consider the prior accident and its consequences. The jury could have compared this report with that of June 4, 1997 (Plaintiff's Exhibit 11), also generated by the emergency department of Middlesex Hospital, concerning the 1997 accident. There, the plaintiff initially complained of neck and back injuries. A cervical collar was applied. See Exhibit 11, p. 2. At a follow-up visit, she complained of shoulder pain and low back pain. The impression was of "muscle strain s/p [status post] MVA [motor vehicle accident]." See Exhibit 11, p. 7.
The plaintiff argues that one of her doctors, Dr. Rutner, evaluated her after both accidents and did not relate the 1998 accident to the 1997 accident. See Plaintiff's Exhibit 11, p. 15 (1997 accident) and Exhibit 13 (1998 accident). In Exhibit 13, Dr. Rutner's notes of May 11, 1998 refer to the prior accident by stating, "See notes 6/3/97-prior auto accident." His 1998 impression, in Exhibit 13, was of low back strain and whiplash. Dr. Rutner, like the other medical professionals, did not testify at the trial. It was the jury's province to assess his notes by, for example, determining whether the brief 1998 notes meant that he did not connect the plaintiff's then-current condition with the 1997 accident, or whether the absence in his notes of a connection between the two accidents in causing her complaints meant that he did not think about whether or not they were connected as causal factors.
The plaintiff also cites the report of Dr. Bellner, a physiatrist, dated May 28, 1998. See Plaintiff's Exhibit 4. At page 2, Dr. Bellner's impression was of "[c]ervical thoracic and lumbar sprain related to a motor vehicle accident 5/8/98." As to past medical history, Dr. Bellner stated, "[s]ignificant for a motor vehicle accident approximately one and half years ago with no residual discomfort." The jury reasonably could have concluded that the plaintiff was not truthful with this physician. First, at the time she saw Dr. Bellner, on May 28, 1998, slightly less than one year had passed since the June 3, 1997 accident, not one and one-half years. Second, the statement of "no residual discomfort" again is directly contradicted by the plaintiff's complaint in the May, 1999 suit, about the June, 1997 incident, in which she complained of pain which she had suffered and "will suffer," and of permanent effects. See CT Page 14196 Defendant's Exhibit A, prior complaint, first count, ¶ 7. Under these circumstances, the jury reasonably could have discounted Dr. Bellner's impression as being based on the plaintiff's untruthful relating of her history.
Similarly, on April 7, 1999, only six weeks before the date of the prior complaint, in which, as described above, she set forth claims for personal injury relating to her lower back, the plaintiff was seen by Richard Diana, M.D. of Connecticut Orthopaedic Specialists, P.C. At that visit, as the plaintiff acknowledged at trial, he took a history from her. Plaintiff's Exhibit 5, his report concerning that visit reflects his evaluation of the plaintiff concerning her complaint of low back pain. According to this report, the plaintiff stated that as a result of the May, 1998 accident "[s]he developed back pain which she never had before and neck pain which she never had before." Under "past medical history," Dr. Diana noted the plaintiff's appendectomy in 1990, but nothing is mentioned concerning the June, 1997 accident or prior low back pain. On cross-examination, the plaintiff stated that she had told Dr. Diana about the prior accident.
The jury reasonably could have concluded that the plaintiff's testimony should not be credited. The jury also reasonably could have determined that the plaintiff's lack of candor with this physician led him to conclude that she had "[c]hronic low back pain, status post May 1998 motor vehicle accident." Plaintiff's Exh. 5, report of April 7, 1999. Likewise, the jury reasonably could have found that her omission of the June, 1997 accident from her history also demonstrated her lack of credibility in general, in that it represented an attempt to exaggerate her claims relating to the May, 1998 accident.
Also, the jury reasonably could have concluded that the plaintiff's approach in this regard was not an isolated instance. Plaintiff's Exhibit 6 includes the reports of Kenneth M. Kramer, M.D., another physician at Connecticut Orthopaedic Specialists, P.C. She was referred to him by Dr. Diana. His report of January 5, 2001 also refers only to the May, 1998 accident, and not to the June, 1997 accident, and states: "[s]he reports having no significant previous history of lower back problems prior to the MVA of 5/9/98." Once again, the "past medical history" makes no reference to the prior accident. As to this physician, the plaintiff stated that she believed that she told him about the prior accident, but that she could not be sure. Again, the jury could well have found that she had not been truthful to this doctor about her condition and that she was not being truthful in her trial testimony either.
In a similar vein, Plaintiff's Exhibit 12, the records of Preferred CT Page 14197 Care, a walk-in medical center, also could reasonably have led the jury to question the plaintiff's veracity. There, notes of a visit by the plaintiff on October 19, 2000 reflect that the plaintiff reported suffering from back pain as a result of a 1997, as opposed to 1998, car accident. At trial, the plaintiff denied telling Preferred Care that she was there due to a 1997 accident. Again, the jury reasonably could have discredited this denial.
On January 3, 2001, the plaintiff was seen again at Preferred Care. The notes for that date state: "[s]houlder and back pain-no known injury per pt."[5] See Plaintiff's Exh. 12. At trial, the plaintiff acknowledged that she did not injure her shoulder in the May, 1998 accident. She agreed that she claimed to have injured her shoulder in the June, 1997 accident. Thus, the jury reasonably could have concluded that medical treatment which the plaintiff was claiming related to the May, 1998 accident actually related to the June, 1997 accident.
In addition, the jury also reasonably could have found that the plaintiff's claims of pain and suffering were fabricated, based on a significant gap of time in medical treatment for her claimed injuries. Plaintiff's Exhibit 4 consists of reports by physiatrists associated with Middlesex Hospital who saw the plaintiff from May, 1998 onwards. On May 25, 1999, she was seen for a follow-up consultation by David A. Monti, M.D. She was not seen there again for almost one year, until May 11, 2000, when Dr. Monti saw her again. See Plaintiff's Exh. 4. He reported that "[s]he has been maintained in Dr. Rutner's office on six Percocet a day and has been doing fairly well." Dr. Rutner's notes, Plaintiff's Exhibit 13, reflect that Dr. Rutner did not see the patient during the gap period, except for a single visit on January 11, 2000. In her testimony, the plaintiff asserted that her symptoms did not go away and that she was on medication during this time. She acknowledged that she could have sought treatment during that period, but did not. Based on this evidence, the jury reasonably could have discounted the plaintiff's claims of pain and suffering.
The jury also reasonably could have found that the plaintiff was not to be believed due to other challenges to her credibility. She acknowledged that she did not report income from her employment as a child care worker on her income tax returns. See Defendants' Exhibit B (income tax returns and wage and tax statements). Similarly, Defendants' Exhibit C1 was presented, which included a response to Interrogatory No. 24 by the plaintiff, dated November 10 2000, more than two years after the May, 1998 accident, in which she stated that she was not claiming an impairment of earning capacity. As noted, this subsequently became one of her claims. In addition, she agreed that six weeks of instruction were required to CT Page 14198 become a certified nurse s assistant (CNA), and that she had never sought such schooling prior to the May, 1998 accident, which occurred when she was twenty-two years old. From this evidence, the jury reasonably could have concluded that her claim of loss of earning capacity due to inability to become a certified nurse's assistant was a fabrication, since she had had ample opportunity to pursue such training in advance of the accident, but did not do so.[6]
As noted, while the plaintiff contends that the evidence of her injuries was undisputed, the extent of claimed injuries was contested at trial. In support of her contention that the verdict was inadequate, the plaintiff cites the impact at the time of the collision, as shown by photographic evidence. See Plaintiff's Exhibits 14-21. The relative severity of the impact did not necessarily equate with the magnitude of the plaintiff's claims or her attribution of her claimed pain and suffering to the May, 1998 accident. Also, the Middlesex Hospital emergency room report states that the plaintiff was "rear-ended by another car at low velocity." Plaintiff's Exhibit 3. The ambulance report, Plaintiff's Exhibit 2, described the speed of the Curtiss' vehicle as "moderate." In his testimony, defendant Charles E. Curtiss, V estimated that he was traveling at about thirty miles per hour before the collision, prior to which he attempted to stop. He described the impact as a "jolt." The plaintiff described it similarly.
She also relies on comments about her injuries in reports which were generated about the accident, by the responding police officer, and ambulance attendant. See Plaintiffs' Exhibits 1 and 2. The ambulance report states that the plaintiff was complaining of lower back pain and some neck pain, and that, after the accident, the plaintiff "had gotten out of the vehicle and walked across the street to call 911." Plainitff's Exhibit 2. It was noted also that she was "collared and boarded from the vehicle." Id. The police report simply states that the plaintiff "was transported to Middlesex Hospital for treatment of injuries sustained in the collision." Plaintiff's Exhibit 1. Each of these reports was based, in meaningful part, on what the plaintiff reported to those individuals who prepared the reports.
As the weighers of the plaintiff's credibility, one of the jury's functions was to assess the veracity of the plaintiff's complaints. SeeHally v. Hospital of St. Raphael, 162 Conn. 352, 359, 294 A.2d 305
(1972). In view of the numerous ways in which the plaintiff's credibility was challenged, the jury could reasonably have found that the plaintiff fabricated her complaints of pain resulting from the May, 1998 accident.[7]
CT Page 14199
In the same vein, the plaintiff's complaints of having to undergo painful injections as part of her treatment was subject to the same jury scrutiny. It was within the jury's province not to credit this testimony as well. Unlike Schroeder v. Triangulum Associates, supra, 259 Conn. 332, the plaintiff's treatment did not involve intrusive surgery.
The plaintiff's economic damages claims included medical bills and related expenses, such as the cost of the ambulance and physical therapy. These totaled $11,059.03. See Plaintiff's Exhibit 10. She also claimed $5,000.00 in lost wages, as well as a loss of earning capacity, and sought an award for future medical treatment. For example, as to lost earning capacity, the plaintiff noted that she was being paid $10.00 an hour as a home health aide, and that a CNA earns $12.00 an hour. Thus, the jury's award of $7,500.00 amounted to significantly less than one-half of the economic damages she claimed.
"The jury could have found that the evidence was sufficient to award [a part of] the expenses of treatment because the expenses were reasonable and necessary and causally related to the [1998] accident, but that the evidence was insufficient to establish that the plaintiff suffered a permanent disability or that [s]he ever felt any substantial pain."D'Ancona v. Metropolitan Property and Casualty Co., Superor Court, judicial district of Waterbury, Docket No. CV 98 0147204 (April 1, 2002,Pittman, J.) (jury awarded $4,904.24 in economic damages and zero in noneconomic damages).
The jury reasonably could have concluded that the evidence of physical injury from the May, 1998 accident was not substantial. See Childs v.Bainer, supra, 235 Conn. 107-118. As in Wichers v. Hatch, supra,252 Conn. 177, there was evidence here that the plaintiff previously had injured the same body part in another accident, for which she received treatment.
The plaintiff also argues that the circumstances here are similar to those in Semrau v. Herrick, Superior Court, judicial district of New Britain at New Britain, Docket No. CV-99-495 656 (February 1, 2001,Shortall, J.), appeal dismissed on other grounds, 72 Conn. App. 327,___ A.2d ___ (2002), in which the trial court ordered an additur of $5,000.00 after a jury award of $3,200.00 for medical expenses and no other damages. There the trial court stated that "[u]nlike Wichers, there was no evidence here that the plaintiff had any preexisting conditions to which the pain and suffering he claimed could have been attributed," noting that there was evidence of a previous accident, but that it was at least eight years in the past and that the plaintiff "suffered no impairment as a result of that collision and was not, at the time of this CT Page 14200 collision, experiencing any pain or receiving any treatment for any injuries resulting from it." Id.
The evidence here differs markedly from that in Semrau. As noted, here the prior accident occurred slightly less than one year before the one at issue, not eight years or more before. Also, the plaintiff claimed that she suffered impairments, and that she anticipated treatment, as a result of that prior accident. Subsequent to the May 8, 1998 accident, she brought suit to recover for these pre-1998 accident consequences in 1999. Thus, in contrast to Semrau, the plaintiff here claimed, in effect, that she was in fact experiencing pain and expected additional treatment for her prior injuries at the time of the May, 1998 accident, since she subsequently claimed to be suffering the consequences of the 1997 accident when she filed suit about it.
Under these circumstances, the verdict should not be set aside. The jury's decision is neither shocking or punitive. Based on the evidence, the jury reasonably could have concluded that the plaintiff did not prove that she experienced substantial pain and suffering as a result of the May, 1998 accident. The award is not inadequate, or inconsistent, or inherently ambiguous. An additur is not warranted.
 Rulings On Evidence
The plaintiff also argues that the court erred in declining to admit Plaintiff's Exhibit 25, which she describes as "Dr. Kramer's clarifying medical report." See Motion To Set Aside, p. 7. This one-page document is dated July 25, 2002, which was the first day of trial. Its text consists of a single sentence: "With reference to my opinion of future medical treatment and medications mentioned in my earlier reports, this opinion is to reasonable medical probability." Plaintiff's Exhibit 25. The plaintiff contends that the court should have admitted this document under General Statutes § 52-174 (b).[8] "This statute serves the purpose of getting medical evidence before the jury in the absence of the treating physician." Lopiano v. Lopiano, 247 Conn. 356, 383, 752 A.2d 1000
(1998).
The plaintiff argues that this document "was introduced to assure the jury that Dr. Kramer's opinions were to the standard to be explained in the charge. The charge of future medical treatment was properly given, however the absence of the standard in Dr. Kramer's reports may have led to skepticism of all his reports, and the improper disregard for competent evidence." Motion To Set Aside, p. 7.
Under § 52-174 (b), the court retains the discretion to consider CT Page 14201 whether or not to admit a document which complies with its terms. SeeSeperack v. Solaz, 17 Conn. App. 684, 692-694, 556 A.2d 175, cert. denied, 211 Conn. 804, 559 A.2d 1138 (1989).
On July 25, 2002, in the midst of her presentation of her case, defense counsel was provided with Plaintiff's Exhibit 25. As one of the bases for his objection to its admission in evidence, he asserted that it was untimely. In addition, he objected on the grounds that the exhibit was offered to highlight what could have been done a long time previously. See Trial Transcript, July 25, 2002, p. 78, 81 (hereafter "Trial Tr., p. _____"). In response to the court's inquiry, defense counsel stated that all medical reports had been requested in discovery and noted the continuing duty to disclose. See Trial Tr., pp. 78-79. Plaintiff's counsel did not dispute the statement by defense counsel that all medical reports previously had been requested in discovery. Instead, he stated that the subject of the "talismanic" language which is set forth in Exhibit 25 was discussed by counsel on the previous day. According to plaintiff's counsel, he was told by defense counsel that the "talismanic" language was not necessary concerning "future medical." Plaintiff's counsel decided that it would be better to get it and he then asked Dr. Kramer to "clarify his report," which resulted in the creation of Exhibit 25. See Trial Tr., p. 80-81. Plaintiff's counsel stated that he could not produce it earlier since "this is when I received it. . . ." Trial Tr., p. 80.
Practice Book § 13-15, formerly Practice Book § 232, requires parties to comply with the continuing duty to disclose.[9] Where a party fails to comply with its provisions, the court may prohibit that party from introducing designated matters in evidence. See Practice Book §13-14(b)(4), formerly Practice Book § 231. Our appellate courts repeatedly have stressed the importance of compliance with the rules concerning discovery. "The purpose of [§ 13-14] is to enforce the parties' continuing responsibilities to disclose. . . . Moreover, the purpose of the rules of discovery is to make a trial less a game of blindman's buff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent." (Internal quotation marks omitted.) Tessmann v. Tiger Lee Construction Co., 228 Conn. 42, 50,634 A.2d 870 (1993).
Dr. Kramer expressed opinions about future medical treatment for the plaintiff in his reports of February 1, 2002 and May 24, 2002, both of which are part of Exhibit 6. In the latter, he stated: "We reviewed the overall situation, the chronic lumbar strain syndrome long plateaued at this point, now approximately 4 years since injury, with no additional formal definitive treatment measures to. recommend, to be managed CT Page 14202 supportively and symtomatically with judicious use of medication, maintenance of therapeutic exercise as taught to her at physical therapy, activity modifications as needed. She will follow and return prn."[10] These exhibits were presented to the jury.
As one of the plaintiff's treating physicians,[11] the plaintiff had the opportunity to and the duty to timely obtain and produce, in advance of trial, whatever reports Dr. Kramer prepared on his own, as well as those which the plaintiff requested him to prepare. See Seperack v.Solaz, supra, 17 Conn. App. 694. If the plaintiff thought that it was necessary to obtain a statement from this physician to the effect that his opinions about future treatment were expressed to a reasonable degree of medical probability, the time to seek it was not on the eve of trial. As her counsel acknowledged, this document was not sought until the day before the trial began and was not provided until trial was underway. Under the circumstances, the plaintiff's provision of Exhibit 25 was untimely.
In addition, this document needlessly called particular attention to the issue of future medical treatment, and had the potential of being confusing to the jury. Our Supreme Court has rejected the notion that "talismanic words" are needed in order to make an opinion by a physician admissible. It has stated that a report need not contain certain "magic words" to show that an opinion is based on reasonable medical probability. State v. Nunes, 260 Conn. 649, 672, 800 A.2d 1160 (2002); seeStruckman v. Burns, 205 Conn. 542, 555, 534 A.2d 888 (1987). Here, the substance of the previously admitted reports included that Dr. Kramer had the requisite certainty about his opinions. There was no suggestion that his opinions were based on speculation or conjecture.
Use of this newly-prepared exhibit to call particular attention to part of the evidence would have been unfairly prejudicial to the defense. See Conn. Code of Evidence § 4-3. The jury had before it ample evidence of Dr. Kramer's previously stated opinions, as reflected in his reports which were admitted, without objection, as Plaintiff's Exhibit 6. SeeHydro-Centrifugals, Inc. v. Crawford Laundry Co., 110 Conn. 49, 54-55,147 A. 31 (1929). The one-sentence statement about reasonable medical probability set forth in Exhibit 25 was disembodied, in that it did not connect itself to the doctor's reports by specific reference. Instead, it referred only to "my earlier reports." Exhibit 6 contains several reports. If Exhibit 25 had been admitted, the jury would have been left to apply the purely legal concept contained in it to the evidence contained in Dr. Kramer's reports. The court exercised its discretion to avoid the potential of jury confusion on this subject. CT Page 14203
After review, the court concludes that its ruling, in which it sustained the defendants' objection to the exhibit, was correct. The verdict should not be set aside on this ground.
The plaintiff also challenges the court's ruling which permitted her to be examined concerning her reason for leaving a previous job in 1998. On cross-examination, over objection, which the court also heard outside the presence of the jury, the plaintiff was questioned as to why she left a previous employment, Dairy Mart. She responded that she was fired for taking property belonging to her employer; in other words, for larceny.[12] In the motion to set aside, the plaintiff contends that the court erred in permitting this evidence to be heard by the jury, since its prejudicial effect outweighed its probative value.
"`The right to cross-examine a witness concerning specific acts of misconduct is limited in three distinct ways. First, cross-examination may only extend to specific acts of misconduct other than a felony conviction if those acts bear a special significance upon the issue of veracity. . . . Second, [w]hether to permit cross-examination as to particular acts of misconduct . . . lies largely within the discretion of the trial court. . . . Third, extrinsic evidence of such acts is inadmissible.' (Internal quotation marks omitted.) State v. Chance,236 Conn. 31, 60, 671 A.2d 323 (1996); see also Martyn v. Donlin,151 Conn. 402, 408, 198 A.2d 700 (1964) (`[i]n an attack on [an adversary's] credit, inquiry may be made, in the discretion of the court, as to particular acts of misconduct tending to show a lack of veracity, even though such evidence might be irrelevant to the issues in the case'); Conn. Code Evid. § 6-6 (b). `It is generally held that larcenous acts tend to show a lack of veracity. . . . It does not follow, however, that if the acts inquired about are indicative of a lack of veracity, the court must permit the cross-examination. Whether to permit it lies largely within the court's discretion.' (Citations omitted; internal quotation marks omitted.) State v. Martin, 201 Conn. 74,87, 513 A.2d 116 (1986)." Schimmelpfennig v. Cutler, 65 Conn. App. 388,397, 783 A.2d 1033, cert. denied, 258 Conn. 934, 785 A.2d 230 (2001).
Our Supreme Court has explained the rationale for permitting evidence concerning previous larcenous acts. "We have consistently recognized that crimes involving larcenous intent imply a general disposition toward dishonesty or a tendency to make false statements. . . . In common human experience acts of deceit, fraud, cheating, or stealing, for example, are universally regarded as conduct which reflects adversely on a [person's] honesty and integrity . . . Consequently, [c]onvictions of this sort obviously bear heavily on the credibility of one who has been convicted of them. The probative value of such convictions, therefore, may often CT Page 14204 outweigh any prejudice engendered by their admission." (Internal quotation marks omitted and citations omitted.) State v. Askew,245 Conn. 351, 363, 716 A.2d 36 (1998).
Here, no extrinsic evidence of the plaintiff's larcenous act was presented. In addition, the court notes that the plaintiff did not request a limiting instruction concerning this evidence. It was referred to again in her re-direct testimony, in which she stated that she had made restitution to her former employer. There were no other references to it in the evidentiary presentation. See Schimmelpfennig v. Cutler, supra,65 Conn. App. 397.
In support of her argument, the plaintiff cites State v. Williams,203 Conn. 159, 185, 523 A.2d 1284 (1987), for the rule that evidence of a witness' prior misconduct "is not ordinarily admissible to prove his bad character or criminal tendencies." See Motion To Set Aside, p. 8. Here, as noted, the evidence was not presented for that purpose; rather, it was presented to challenge the plaintiff's credibility, which she, herself, had placed in issue. In addition, she cites State v. Perry, 195 Conn. 505,523, 488 A.2d 1256 (1985), where evidence that a police officer had violated police rules was not allowed to impeach his credibility. There, our Supreme Court stated, "A lay witness would not be subject to cross-examination concerning collateral bad acts unless they involved veracity. . . ." Id. As noted, the evidence which the plaintiff, a lay witness, challenges here concerns her prior bad act, involving larceny, which implicated her own veracity.
Where a case depends, in large part, on the jury's assessment of the credibility of a particular witness, as this case did concerning the plaintiff's testimony, and where the act in question, larceny, "has a direct and substantial bearing on her veracity," it is appropriate to permit the evidence to be heard. State v. Askew, supra, 245 Conn. 369-370. See Kucza v. Stone, 155 Conn. 194, 198-199, 230 A.2d 559 (1967). Under the circumstances, the probative value of the evidence outweighed its prejudicial effect. See State v. Askew, supra, 245 Conn. 371. Likewise, the court is unpersuaded that the admission of this evidence misled the jury or caused confusion of the issues. See Connecticut Code of Evidence § 4-3 (and Commentary). After review, the court concludes that it did not err in allowing the questioned evidence.
The motion to set aside is denied.
 III. Motion For Costs A. Section 52-568
CT Page 14205
In the motion for costs, the plaintiff cites General Statutes §§52-568 and 52-245 and seeks double damages, double costs, and counsel fees, based on the claim that the defendants asserted special defenses "without any factual basis or probable cause." In their original answer, dated June 12, 2000 (#101), which was filed shortly after the return day, the defendants pleaded two special defenses, based on General Statutes § 14-242 (c) and on the common law. In each, the defendants alleged that the plaintiff caused her own injuries, as a result of her own negligence, when she "stopped and/or suddenly decreased the speed of [her] vehicle without first giving an appropriate signal." On the eve of trial, the defendants filed their amended answer, dated July 24, 2002 (#110.25), in which liability was admitted and the special defenses were omitted.
Section 52-568 provides: "[a]ny person who commences and prosecutes any civil action or complaint against another, in his own name or the name of others, or asserts a defense to any civil action or complaint commenced and prosecuted by another (1) without probable cause, shall pay such other person double damages, or (2) without probable cause, and with a malicious intent unjustly to vex and trouble such other person, shall pay him treble damages." Our Supreme Court has stated that § 52-568
contemplates a vexatious suit action. See DeLaurentis v. New Haven,220 Conn. 225, 237 n. 3, 597 A.2d 807 (1991); Shea v. Chase NationalBank, 64 Conn. App. 624, 628, 781 A.2d 352 (2001).
"[A] vexatious suit is a type of malicious prosecution action, differing principally in that it is based upon a prior civil action, whereas a malicious prosecution suit ordinarily implies a prior criminal complaint. To establish either cause of action, it is necessary to prove want of probable cause, malice and a termination of suit in the plaintiff's favor." (Internal quotation marks omitted.) DeLaurentis v. NewHaven, supra, 220 Conn. 248. "Probable cause is the knowledge of facts sufficient to justify a reasonable person in the belief that there are reasonable grounds for prosecuting an action." Vandersluis v. Weil,176 Conn. 353, 356, 407 A.2d 982 (1978).
In response to the motion for costs, the defendants contend that a prerequisite for bringing such a vexatious suit action is a special finding by this court pursuant to General Statutes § 52-226a, which provides, in pertinent part: "[i]n any civil action tried to a jury, after the return of a verdict and before judgment has been rendered thereon, . . . not more than fourteen days after judgment has been rendered, the prevailing party may file a written motion requesting the court to make a special finding to be incorporated in the judgment or CT Page 14206 made a part of the record, as the case may be, that the action or a defense to the action was without merit and not brought or asserted in good faith. Any such finding by the court shall be admissible in any subsequent action brought pursuant to section 52-568." See Beverlyv. State, 44 Conn. App. 641, 648-649, 691 A.2d 1093 (1997).
Such a finding is not a prerequisite to the commencement of a vexatious suit action. As set forth above, the legislature provided that such a request for a finding "may" be made, and that such a finding is admissible in a subsequent action. See § 52-226a. It did not require that such a finding be made as a threshold step to bringing a vexatious suit claim. See Shea v. Chase Manhattan Bank, Superior Court, judicial District of Stamford-Norwalk at Stamford, Docket No. CV-96-0149647 (June 15, 2000, Tierney, J.) ("No motion for special finding is necessary prior to the commencement of a vexatious litigation lawsuit.")
Nevertheless, it is clear that what is contemplated is a separate action for the relief authorized in § 52-568, not a request for the awarding of double damages as part of the underlying suit. See Shea v.Chase Manhattan Bank, Superior Court, judicial District of Stamford-Norwalk at Stamford, Docket No. CV-96-0149647 (June 15, 2000,Tierney, J.). The request for an award of double damages pursuant to § 52-568 is premature and, accordingly, is denied.
 B. Section 52-245
General Statutes § 52-245 provides: "[i]n any case in which an affidavit has been filed by the defendant, or a statement that he has a bona fide defense has been made to the court by his attorney, and the plaintiff recovers judgment, if the court is of the opinion that such affidavit was filed or statement made without just cause or for the purpose of delay, it may allow to the plaintiff, at its discretion, double costs, together with a reasonable counsel fee to be taxed by the court." Here, the plaintiff does not claim that the withdrawn special defenses were asserted for the purpose of delay. As noted, she contends that they were pleaded without probable cause and seeks double costs and counsel fees based on § 52-245.
In their objection to the motion for costs, the defendants contend that the statute is inapplicable to this case, since no affidavit was filed and "absolutely no statements of a defense were made before this court as this was a case of admitted liability and was introduced to the jury panel as such." See Objection (#114), p. 4. As to the withdrawn special defenses, the defendants "note that these special defenses were withdrawn prior to trial and were never prosecuted by the defendants. . . . [T]here CT Page 14207 was never any issue raised at trial by the defendants regarding liability on the part of the plaintiff." Objection (#114), p. 3.
Section 52-245 does not require that a defendant's statement of his or her defense be made at trial. Rather, the language simply refers to a statement made to the court. While the statute does not define the meaning of the term "statement," it is clear that our legislature meant to include within its purview the pleading of special defenses in an answer filed by an attorney.
"[S]tatutory interpretation is a question of law." (Internal quotation marks omitted.) Collins v. Colonial Penn Ins. Co., 257 Conn. 718, 728,778 A.2d 899 (2001). "When we construe a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . . Furthermore, [w]e presume that laws are enacted in view of existing relevant statutes . . . because the legislature is presumed to have created a consistent body of law." (Internal quotation marks omitted.) Id., 728-29.
"We construe each sentence, clause or phrase to have a purpose behind it. . . . In addition, we presume that the legislature intends sensible results from the statutes it enacts. . . . Therefore, we read each statute in a manner that will not thwart its intended purpose or lead to absurd results. . . ." (Citations omitted; internal quotation marks omitted.) Collins v. Colonial Penn Ins. Co., supra, 257 Conn. 728-29. "Words in a statute must be given their plain and ordinary meaning . . . unless the context indicates that a different meaning was intended. . . . No word or phrase in a statute is to be rendered mere surplusage. . . . In applying those principles, we keep in mind that the legislature is presumed to have intended a reasonable, just and constitutional result." (Citations omitted; internal quotation marks omitted.) Gelinas v. WestHartford, 65 Conn. App. 265, 276, 782 A.2d 769, cert. denied,258 Conn. 926, 783 A.2d 1028 (2001).
Where a statute uses an undefined "technical word . . . that ha[s] a particular meaning in the law" our Supreme Court has looked to Black's Law Dictionary for its definition. Nizzardo v. State Traffic Commission,259 Conn. 131, 162, 788 A.2d 1158 (2002), citing General Statutes § 1-1
(a).[13] As used in § 52-245, "statement" is such a technical word. In the nearest relevant context, Black's defines "statement" as meaning "a formal and exact presentation of facts." Black's Law CT Page 14208 Dictionary (Seventh Ed. 1999), p. 1416.[14]
In addition, this understanding of the word "statement" comports with its usage in the rules of practice. For example, Practice Book § 10-1
states that a pleading must contain "a plain and concise statement of the material facts on which the pleader relies. . . ." Similarly, in the context of pleading denials, Practice Book § 10-50 states that "[n]o facts may be proved under a general or special denial except such as show that the plaintiff's statements of facts are untrue."
Section 52-245's reference to a "bona fide defense" is similar to Practice Book § 13-19, which provides for a demand for a disclosure of defense in any action to foreclose or discharge a mortgage or lien or to quiet title, or in any action based on written contract. In response to such a demand, disclosure is required by a "writing signed by the attorney stating whether he or she has reason to believe and does believe that there exists a bona fide defense to the plaintiff's action and whether such defense will be made, together with a general statement of the nature or substance of such defense." Practice Book § 13-19.
Clearly, in contrast to Practice Book § 13-19, § 52-245's applicability is not limited to particular categories of actions. If the legislature had meant to circumscribe its breadth, "it easily could have so provided." Giaimo v. New Haven, 257 Conn. 481, 497, 778 A.2d 33
(2001).
The conclusion that a "statement," as set forth in § 52-245, includes the pleading of a special defense, "is further supported by the well established canon of statutory construction that [i]n construing a statute, common sense must be used and courts must assume that a reasonable and rational result was intended." (Internal quotation marks omitted.) Nizzardo v. State Traffic Commission, supra, 259 Conn. 164.
Both the Rules of Professional Conduct and the Practice Book direct an attorney to ensure that pleadings which are filed are well grounded. Rule of Professional Conduct 3.1 states that "[a] lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law." Practice Book § 4-2(b) sets forth that "[t]he signing of any pleading, motion, objection or request shall constitute a certificate that the signer has read such document, that to the best of the signer's knowledge, information and belief there is good ground to support it, and that it is not interposed for delay." Section 52-245's provision for potential penalties where an attorney's statement of a CT Page 14209 defense in a pleading is made in violation thereof is consistent with these other rules. See also Lomme Douglas v. Bogdan Aldrich, Superior Court, judicial district of Middlesex at Middletown, Docket No. CV95-0074840S (February 21, 1996, Lavine, J.) (statement of defenses in answer found to constitute "statement" under § 52-245; court noted also that no affidavit was filed).
Accordingly, the court concludes that the withdrawn special defenses are "statements" made to the court under § 52-245. Under such circumstances, since the plaintiff here recovered judgment, the court must determine whether they were pleaded "without just cause" and, if so, whether, in its discretion, it should award to the plaintiff double costs and a reasonable counsel fee. See § 52-245.
The defendants assert that "[i]n the present case, there is no showing that the special defenses were made for reasons of harassment, delay or other improper purposes. They were simply special defenses filed at the beginning of the case, which ultimately proved not to be viable defenses." Objection (#114), p. 3. Thus, the defendants do not assert that they had a factual basis for pleading the special defenses when they were filed in June, 2000. As noted, the special defenses were abandoned on the eve of trial and liability was conceded.
The commentary to the Rule of Professional Conduct 3.1 provides guidance here. It states: "[t]he filing of an action or defense or similar action taken for a client is not frivolous merely because the facts have not first been fully substantiated or because the lawyer expects to develop vital evidence only by discovery. Such action is not frivolous even though the lawyer believes that the client's position ultimately will not prevail. The action is frivolous, however, if the client desires to have the action taken primarily for the purpose of harassing or maliciously injuring a person or if the lawyer is unable either to make a good faith argument on the merits of the action taken or to support the action taken by a good faith argument for an extension, modification or reversal of existing law."
Based on this record, it is apparent that the special defenses, which asserted that the plaintiff was at fault in this accident in which she was struck from behind while stopped at a red light, were pleaded "without just cause." The defendants have not provided any factual basis for their pleading. Merely stating that they were "filed at the beginning of the case" does not satisfy § 52-245's requirement of "just cause." In contrast to the standard discussed in the commentary quoted above, the assertions in the special defenses apparently were not substantiated at all. They do not appear to have been premised on a permissible CT Page 14210 preliminary assessment of the merits, based on facts which were yet to be "fully substantiated."
Whether to award double costs and counsel fees under § 52-245 is "in the sound discretion of the trial court." Logical Communications,Inc. v. Morgan Management Corp., 4 Conn. App. 669, 671, 496 A.2d 239
(1985). The statute does not provide a standard by which to determine if such awards are to be made. "Where a statute contains no standard by which a court is to award attorney's fees, it is left to the sole discretion of the trial court to determine if attorney's fees should be awarded and the amount of such an award." (Internal quotation marks omitted.) Oakley v. Commission On Human Rights And Opportunities,38 Conn. App. 506, 521, 662 A.2d 137 (1995), affirmed, 237 Conn. 28,675 A.2d 851 (1996). "An award of attorney's fees is not a matter of right. Whether any award is to be made and the amount thereof lie within the discretion of the trial court, which is in the best position to evaluate the particular circumstances of a case." LaMontagne v. Musano,Inc., 61 Conn. App. 60, 63-64, 762 A.2d 508 (2000). "Sound discretion, by definition, means a discretion that is not exercised arbitrarily or wilfully, but with regard to what is right and equitable under the circumstances and the law. . . ." (Internal quotation marks omitted.)Food Studio, Inc. v. Fabiola's, 56 Conn. App. 858, 865, 747 A.2d 7
(2000).
In an analogous context, Practice Book § 10-5, concerning untrue allegations or denials, provides for the awarding of reasonable expenses "as may have been necessarily incurred by the other party by reason of such untrue pleading; provided that no expenses for counsel fees shall be taxed exceeding $500 for any one offense."
In the motion for costs, the plaintiff does not show how, if at all, she may have been prejudiced by the assertion of the special defenses. For example, she does not assert that, due to their presence in the case, she was required to expend extra effort to marshal proof in order to refute them. At the hearing on the post-verdict motions, she contended that the question of whether she had caused the accident had to be addressed in preparation for her deposition. She suggested that such defenses are generally designed to scare off plaintiffs.
The trial essentially amounted to a hearing in damages. The evidence concerning the accident was provided primarily through the plaintiff's testimony, that of the police officer who responded to the accident scene, and that of defendant Charles E. Curtiss, V. Such evidence logically would have been presented whether the special defenses had been pleaded or not. There has been no showing that any extra costs were CT Page 14211 incurred as a result of the filing of the special defenses. The court is unpersuaded that defense counsel in this case inserted the defenses into the answer as an intimidation tactic.
The court is mindful that observance of statutes and rules concerning pleadings has an importance beyond that of the individual case. "The trial court has the authority to regulate the conduct of attorneys and has a duty to enforce the standards of conduct regarding attorneys." Bergeronv. Mackler, 225 Conn. 391, 397, 623 A.2d 489 (1993). "The court further has the inherent power to discipline members of the bar and `to provide for the imposition of reasonable sanctions to compel the observance of its rules.' (Internal quotation marks omitted.) Gionfrido v. WharfRealty, Inc., 193 Conn. 28. 33, 474 A.2d 787 (1984). [T]he task of determining whether sanctions should be imposed is inherently fact bound, and requires carefully circumscribed discretion to be exercised by the trial court." (Internal quotation marks omitted.) Yamin v. Savarese Schefiliti, P.C., 58 Conn. App. 171, 175, 753 A.2d 388, cert. denied, 254 Conn. 917, 759 A.2d 508 (2000).
Recent decisional law provides guidance for the court as to when sanctions in the form of attorney's fees are appropriate where counsel has failed to comply with the rules governing pleadings. In Yamin v.Savarese Schefiliti, P.C., supra, the trial court ordered sanctions, based in part on a violation of Practice Book § 4-2, finding that an attorney had knowingly misstated the content of a discovery response, and was affirmed. Id., 176. Subsequently, the court in Ostrander v. Ostrander, Superior Court, judicial district of Litchfield at Litchfield, Docket No. FA01-0084608S (January 4, 2002,DiPentima, J.), awarded attorney's fees, also based on violation of Practice Book § 4-2, after an attorney's filing which contained four instances of misinformation and misleading statements.
Here, there is no evidence that the special defenses were knowing misstatements. They represent a single instance, not multiple instances of noncompliance with § 52-245. The defenses employed the same alleged facts concerning a sudden stop or decrease in speed to advance two different legal theories. As noted above, it is also significant that the plaintiff points to no additional expenses which she incurred and to no additional expenditure of attorney time as a result of the pleading of the special defenses. Accordingly, based on the record in this case, in the exercise of its discretion, the court declines to order double costs or attorney's fees. This does not excuse the filing of defenses without a basis. Defense counsel is cautioned to better observe the rules in the future. CT Page 14212
 III. Motion For Special Finding
In her motion for special finding, the plaintiff seeks, pursuant to General Statutes § 52-226a, a finding by the court that the special defenses "were without merit and not brought or asserted in good faith." For the reasons set forth below, the court determines that such a finding is unwarranted.
General Statutes § 52-226a provides: "[i]n any civil action tried to a jury, after the return of a verdict and before judgment has been rendered thereon, or in any civil action tried to the court, not more than fourteen days after judgment has been rendered, the prevailing party may file a written motion requesting the court to make a special finding to be incorporated in the judgment or made a part of the record, as the case may be, that the action or a defense to the action was without merit and not brought or asserted in good faith."[15]
"A special finding under General Statutes § 52-226a can be made only when two elements have been shown: (1) `the action was without merit' and (2) `the action . . . was not brought or asserted in good faith.' Both must be found in order for `the court to make a special finding.' Trial courts have upheld the denial of a motion for special finding in which the plaintiff's action was determined to be commenced without merit but the court had insufficient evidence to make a finding that it was not brought or asserted in good faith." Shea v. ChaseManhattan Bank, Superior Court, judicial district of Stamford-Norwalk at Stamford, Docket No. CV 96 0149647 (June 15, 2000, Tierney, J.).
"[I]n common usage, it (good faith) has a well defined and generally understood meaning, being ordinarily used to describe that state of mind denoting honesty of purpose, freedom from intention to defraud, and generally speaking means being faithful to one's duty or obligation. . . ." (Internal quotation marks omitted.) Id.
In construing § 52-226a, our Appellate Court has stated, "[W]e have declined to uphold awards under the bad-faith exception absent both clear evidence that the challenged actions are entirely without color and [are taken] for reasons of harassment or delay or for other improper purposes. . . ." (Internal quotation marks omitted.) Beverly v. State,44 Conn. App. 641, 648-649, 691 A.2d 1093 (1997).
The facts and procedural history in Beverly are instructive, as they bear similarity to certain of those present in the record here. There, the plaintiff was a passenger in a state department of correction van when it collided with the rear of a vehicle which was stopped for a red CT Page 14213 light. Id., 642. He then commenced a civil action in order to recover for personal injuries sustained in the accident. "The state conceded liability and the matter was heard by a jury as to damages only." Id., 643. The jury rendered a verdict for the plaintiff, and awarded him damages. See id. Thereafter, the plaintiff sought a special finding under § 52-226a, contending that "the state's admission of negligence shortly before the hearing in damages violated that statute." Id., 648. The trial court denied the motion.
In affirming the trial court, the Appellate Court concluded that "[t]he record before us does not indicate that any evidence was presented to the trial court to demonstrate that the defense raised by the defendants prior to trial was entirely without color and [raised] for reasons of harassment or delay or for other improper purposes. . . ." (Internal quotation marks omitted.) Id., 649. See also Caciopoli V. Neri Brothers Construction Corp., Superior Court, judicial district of Middlesex at Middletown, Docket No. CV92-0067375 (March 17, 1998, Aurigemma, J.) (court cannot find violation of § 52-226a "merely because the defendant did not thoroughly investigate various aspects of its claim. . . .").
While the record here, including the defendants' admission of liability, demonstrates that the special defenses were without merit, there is no evidence to show that they were advanced for harassment or delay or for other improper purposes. Under these circumstances, there is no basis on which to conclude that the special defenses were advanced in bad faith. Since such a determination is a prerequisite for a special finding under § 52-226a, the motion must be denied.
 IV. Motion For Collateral Source Reductions
General Statutes § 52-225a (b) states that "[u]pon a finding of liability and an awarding of damages by the trier of fact and before the court enters judgment, the court shall receive evidence from the claimant and other appropriate persons concerning the total amount of collateral sources which have been paid for the benefit of the claimant as of the date the court enters judgment."[16] General Statutes § 52-225a (a) provides that the court shall reduce the amount of an economic damages award "by an amount equal to the total of amounts determined to have been paid under subsection (b) of this section less the total of amounts determined to have been paid under subsection (c) of this section, except that there shall be no reduction for (1) a collateral source for which a right of subrogation exists. . . ."
Our Supreme Court has explained that "[c]onventional subrogation can CT Page 14214 take effect only by agreement and has been said to be synonymous with assignment. It occurs where one having no interest or any relation to the matter pays the debt of another, and by agreement is entitled to the rights and securities of the creditor so paid. . . . By contrast, [t]he right of [equitable] subrogation is not a matter of contract; it does not arise from any contractual relationship between the parties, but takes place as a matter of equity, with or without an agreement to that effect." (Citation omitted and internal quotation marks omitted.) Westchester FireInsurance Co. v. Allstate Insurance Co., 236 Conn. 362, 371, 672 A.2d 939
(1996). A right of subrogation may be established by statute. See Nuzzov. Nationwide Mutual Insurance Co., Superior Court, judicial district of New Haven, Docket No. 394015 (April 8, 1999, Levin, J.) (24 C.L.R. 388).
At the hearing on October 28, 2002, the court received evidence concerning collateral source payments. A portion of the plaintiff's pre-trial interrogatory responses was presented as an exhibit. See Defendants' Exhibit A, 10/28/02. Interrogatory 19 asked the plaintiff to identify each item of expense for which she has been reimbursed or which is reimbursable by an insurer. In response, the plaintiff stated, "Mohegan Tribal Medical Services paid the medical bills." The defendants did not offer any evidence to contest this assertion. In addition, the parties subsequently presented memoranda on the subject of collateral source payments.
The Mohegan Tribe of Indians of Connecticut has been granted federal acknowledgment by congressional enactment. See 25 U.S.C. § 1775
(a)(1); State v. Sebastien, 243 Conn. 115, 131 n. 27, 701 A.2d 13
(1997). It received such recognition in 1994. See The Mohegan Tribe ofIndians of Connecticut v. The Mohegan Tribe and Nation, Inc.,255 Conn. 358, 361, 769 A.2d 34 (2001).
Under the federal Indian Health Care Improvement Act (the Act), an Indian tribe or tribal organization has the subrogation right to recover expenses incurred in providing health services to individuals. See25 U.S.C. § 1621e.[17] "Congress enacted the Indian Health Care Improvement Act, Pub.L. No. 94-43 7, 90 Stat. 1400 (1976), having found that `[f]ederal health services to maintain' and improve the health of the Indians are consonant with and required by the Federal Government's historical and unique legal relationship with, and resulting responsibility to, the American Indian people.' 25 U.S.C. § 1601 (a) (West 1983). Congress declared that `it is the policy of this Nation, in fulfillment of its special responsibilities and legal obligation to the American Indian people, to meet the national goal of providing the highest possible health status to Indians and to provide existing Indian health services with all resources necessary to effect that policy.' Id. CT Page 14215 § 1602(a) (West Supp. 1997). The purpose of the Act was to ensure sufficient resources to provide Indians with proper health care and adequate funding to construct modern hospitals and other health care facilities." U.S. ex rel. Norton Sound Health Corp. v. Bering StraitSchool District, 138 F.3d 1281, 1282 (9th Cir.), cert. denied,525 U.S. 962, 119 S.Ct. 403, 142 L.Ed.2d 327 (1998).
"Congress preempted all provisions of state and local law, and all contract provisions, that would `prevent or hinder' recovery of reimbursement. See 25 U.S.C. § 1621e (c)." Id., 1283 (noting that the only exception pertained to the right of the United States to recover from a State being limited to treated conditions under workers' compensation laws or a no-fault automobile insurance program).
Section 1621e (c) of the Act states; "[n]o law of any State, or of any political subdivision of a State, and no provision of any contract entered into or renewed after November 23, 1988, shall prevent or hinder the right of recovery of the United States, an Indian tribe, or a tribal organization under subsection (a) of this section." Thus, the Act is consistent with General Statute § 52-225c, which states, "[u]nless otherwise provided by law, no insurer or any other person providing collateral source benefits as defined in section 52-225b shall be entitled to recover the amount of any such benefits from the defendant or any other person or entity as a result of any claim or action for damages for personal injury or wrongful death regardless of whether such claim or action is resolved by settlement or judgment." The Act's provisions confer a right of subrogation "otherwise provided by law."
In view of these provisions of the Act, the exception set forth in General Statutes § 52-225a (a), to the effect "that there shall be no reduction for . . . a collateral source for which a right of subrogation exists. . . ." is applicable. Since the Mohegan Tribe or a Mohegan tribal organization has, according to federal law, a right of subrogation as to the expenses it paid for the plaintiff's health care, the amount of the jury's award may not be reduced under Connecticut's statutory scheme concerning collateral sources.
Under these circumstances, the court need not address whether or not the payments were provided by a collateral source as defined by General Statute § 52-225b. The motion for collateral source reductions is denied.
 CONCLUSION
For the foregoing reasons, the plaintiff's motion to set aside the CT Page 14216 verdict and for a new trial, or for additur, is denied. The plaintiff's motion for double damages and double costs and counsel fees and her motion for special finding are also denied. The defendants' motion for collateral source reductions is denied as well. Judgment may enter for the plaintiff, in the amount of $7,500.00, in accordance with the jury's verdict, exclusive of costs. It is so ordered.
BY THE COURT
 ___________________ ROBERT B. SHAPIRO JUDGE OF THE SUPERIOR COURT